Richard S. POWELL, et al., Plaintiffs,

v.

FIRST REPUBLIC BANK,
et al., Defendants.

No. MISC.A.02–64.

United States District Court,
E.D. Pennsylvania.

July 29, 2003.

Craig Robert Lewis, Braverman Kaskey & Caprara, David L. Braverman, Braverman, Kaskey & Caprara, Oscar S. Schermer, Steven L. Bloch, Braverman Kaskey, Michelle S. Walker, Braverman Kaskey, Philadelphia, for Richard S. Powell, Jon R. Powell, Carol P. Heller, Nancy E. Powell, James R. Schaeffer, Anthony L. Schaeffer, Robert D. Schaeffer, James M. Dougherty,

Steven D. Brand, FBMC Acquisition Co., A Pennsylvania Corporation, Fidelity Bond & Mortgage, Fidelity Bond & Mortgage Company, Plaintiffs.

Paul R. Rosen, Spector Gadon & Rosen,P.C., Suzanne Ilene Schiller, Spector Gadon & Rosen PC, Tina L. Colman, Spector Gadon & Rosen, PC, Philadelphia, for First Republic Bank, A Pennsylvania Banking Corporation, Jere A. Young, George A. Rapp, Harry Madonna, Defendants.

## MEMORANDUM AND ORDER

KATZ, Senior District Judge.

Plaintiffs in the above-titled action bring a derivative suit on behalf of Fidelity Bond and Mortgage Company and FBMC Acquisition Company against First Republic Bank and its individual officers and directors. First Republic Bank has counterclaimed that the individual plaintiffs breached their obligations under a Letter of Intent and Definitive Agreement involving the merger transaction creating Fidelity Bond and Mortgage Company. Presently before the court are defendants' motion for summary judgment and plaintiffs' motion for partial summary judgment on First Republic Bank's counterclaim. For the reasons set forth below, defendants' motion is granted and plaintiffs' motion is granted in part.

1.  Brand was a member of the Board from its inception through May 14, 1999.

2.  Young is the former President and CEO of Republic First Bancorp, the Bank's holding company. Young served on the Board from October 1998 through November 2001.

3.  Rapp is the former CFO of the Bank and Republic First Bancorp. Rapp served on the Board from its inception through August 2000.

4.  Madonna was Republic First Bancorp's Chairman of the Board. Madonna served as

## I.  Factual Background

This lawsuit arises out of the events leading up to the July 1999 bankruptcy of Fidelity Bond and Mortgage Company. In May of 1998, First Republic Bank ("Bank"), Phoenix Mortgage Company ("Phoenix"), and Fidelity Mortgage Company ("Fidelity") closed a merger transaction that created a holding company, FBMC Acquisition Company, as well as Fidelity Bond and Mortgage Company ("FBMC"). FBMC Acquisition was the sole shareholder of FBMC which was in the business of originating and servicing mortgage loans. Following the merger, the Bank owned 47% of FBMC Acquisition shares, the plaintiffs—Fidelity's selling shareholders—owned 20%, Don Salmon, former CEO of Phoenix, along with two other individuals not named in the lawsuit owned 26.5%, and Ron White, a former Phoenix shareholder, owned 6.5%. The following individuals made up FBMC's Board of Directors: plaintiff Steven Brand,[1] defendant Jere Young,[2] defendant George Rapp,[3] defendant Harry Madonna,[4] defendant Don Salmon,[5] and Ron White.[6]

The Letter of Intent ("LOI") dated January 7, 1998, later incorporated into the Definitive Agreement dated May 1, 1998, set forth the terms of the merger transaction. The LOI provided that each purchaser would pay for their common stock

a member of the FBMC Board from its inception through October 6, 1998.

5.  Salmon served on the Board from its inception until August 1999 when he left FBMC's employ. Salmon was the President, Chief Executive Officer, and Chairman of the Board of FBMC.

6.  White was an officer and a member of the FBMC's Board from its inception through June 1999.

in Fidelity an amount equal to their ownership based on an approximate net worth of $4,000,000. *See* Pls.' Mem. in Support of Mot. for Summ. J., Exh. A at ¶ 1(b). However, the $4,000,000 figure was an estimated figure which was conditioned on a Summit Bank term loan of at least $7,000,000.00 that was to be secured by Fidelity's mortgage servicing rights as well as other collateral. *Id.* Prior to the closing of the purchasing agreement, accountants would determine the final purchase price as of December 31, 1997 which would be at least $2,500,000 but not more than $4,500,000. *Id.* In calculating the final purchase price, the LOI provided:

(d) [Fidelity] and its accountants, Rudolph Palitz & Co., on the one hand, and [the Bank] and Phoenix and their accountants on the other, shall cooperate in determining as soon after December 31, 1997 but no later than January 20, 1998 preliminary closing figures for closing, subject to final purchase price adjustment within sixty (60) days after the

closing based on audited financial statements (the "Purchase Price").

*Id.* Furthermore, Fidelity would distribute to the selling shareholders all but $500,000 in cash prior to the closing.[7] *Id.* On the day of settlement, the selling shareholders suggested (through their representative Stephen Brand) that Fidelity's net worth was actually $3.5 million rather than $4 million. Defs.' Resp. to Pls.' Mot. for Partial Summ. J. Exh. B at 112 (test. of D. Salmon). The draft of the post-closing audit prepared by Rudolph Palitz shows that Fidelity's actual net worth at closing was $3,084,471. Cert. of Counsel in Support of Defs.' Mot. for Summ. J., Exh. 11 at 2.[8] According to the accountant, the selling shareholders received $415,628.00 more than the appropriate price. *Id.* Forty-seven percent of this amount, the percentage of the Bank's ownership, would be $195,345.00. *Id.*

Following the merger, FBMC suffered severe financial difficulties.[9] In October 1998, the FBMC Board of Directors concluded that its best course of action was to

---

7. Under this provision, the selling shareholders received a pre-merger distribution of $1,750,000.

8. Hereinafter, the certification of counsel, filed with defendant's motion for summary judgment, will be cited as Cert. of Counsel at #.

9. The parties disagree as to the cause of the new entity's financial woes. Defendants claim that due to the overvaluation of Fidelity's portfolio prior to the sale, the value of Fidelity's assets were lower than anticipated. According to the defendants, FBMC was unable to meet Summit Bank's borrowing covenants that FBMC's loans could not exceed 1.44% of the value of FBMC assets. Therefore, FBMC had no availability on its line of credit. Plaintiffs claim that the Bank and Phoenix were aware of FBMC's value and that the decline in Fidelity's servicing portfolio "was the result of natural market forces operating throughout the mortgage banking industry." *See* Pls.' Mot. for Partial Summ.

J., Exh. L at 5. The Angstreich report concludes that FBMC failed because:

1. There was a substantial decline in interest rates shortly after the merger which spurred significant refinancings and with it a significant decrease in the number of mortgages being serviced by the company;
2. As interest rates declined and as mortgages were being refinanced, there was a need to revalue the portfolio. This impairment reduced the balance sheet asset as the company was required to book the servicing portfolio at the lower of cost or market and, since the market was lower than cost, the portfolio was devalued;
3. With the portfolio devalued, Fidelity was out of compliance with its lenders and there was no cushion in GAAP equity ... since Fidelity had book equity of $3.1 million, and
4. The company's funds were used for items not originally contained within the pre-closing projections.

Cert. of Counsel, Exh. 34 at 10.

sell FBMC's assets. Plaintiff Steven Brand contacted Keystone Bank as a potential purchaser. Keystone prepared a series of term sheets and on January 22, 1999 the FBMC Board reviewed one of these offers. According to James Matour, counsel to FBMC beginning in 1999, "Keystone appeared to be the leading candidate to be a purchaser, although I don't think they were the only ones in the game at that point. And that term sheet, the deal represented by the term sheet was not rich enough and raised issues and needed a lot of work and needed to be improved if it was going to ripen into a deal." Pls.' Resp. to Defs.' Mot. for Summ. J., Exh. E at 13–14 (dep. of J. Matour). In early February, after months of negotiation, Keystone made another offer in excess of $9.8 million. The FBMC Board discussed this proposal at a special board meeting on February 10, 1999. All the directors present at the meeting agreed that the Keystone deal was in the best interests of FBMC and should be accepted.[10] The Board members unanimously agreed to aggressively pursue the Keystone deal.[11] The Board convened a meeting of the shareholder representatives on February 14, 1999 to discuss the Keystone offer. Attendees at the meeting included, among others, Young, Rapp, Salmon, Brand, William Moorehouse (the selling shareholders' attorney), Edward G. Fitzgerald (the Bank's attorney) and Matour. Under the terms of Keystone's offer, all creditors would be paid, the Bank would receive the benefit of a $3.2 million net operating loss,

and the shareholders would be paid last. Everyone at the meeting agreed that FBMC should enter the Keystone deal.[12]

Following the meeting, however, there were additional discussions regarding the terms of the deal. Harry Madonna, Chairman of the Board for the Bank's holding company, was reluctant about the Keystone deal and, plaintiffs' contend, "nixed the deal" as negotiated at the February 14th meeting. Pls.' Resp. to Defs.' Mot. for Summ. J., Exh. E at 51 (dep. of J. Matour). Fitzgerald informed Salmon and the selling shareholders that the Bank wanted additional cash payments in exchange for allowing them to participate in the net operating loss. In the following days, the FBMC's shareholders continued to negotiate and circulated drafts of a written Memorandum of Understanding memorializing the details of the Keystone transaction. The Memorandum provided, in pertinent part:

1. The terms and conditions of this Memorandum of Understanding are specifically conditioned upon the acquisition of all or substantially all of the assets of FBMC by Keystone Bank, a Pennsylvania Banking corporation or an affiliate thereof ("Keystone"), pursuant to the terms of an agreement (the "Keystone Agreement") substantially in accordance with a certain term sheet dated February 8, 1999 (the "Keystone Transaction"). If for any reason, there is a failure to close or settle the Keystone Transaction, this Memorandum shall be null and void, and of no further force

---

**10.** Defendant George Rapp did not attend the February 10th meeting.

**11.** The parties disagree whether there were outstanding issues with the Keystone deal. The defendants contend that Summit, FBMC's lender, had to agree to various concessions, Salmon had to make concessions on his trade debt and subordinated debt, and the Selling Shareholders had to concede on their

subordinated debt. The plaintiffs contend that the deal was in its final form.

**12.** According to the plaintiffs, "[e]veryone believed that the deal was completed at the end of the February 14, 1999 meeting." Pls.' Resp. to Defs.' Mot. for Summ. J. Exh. A at 44–45 (dep. of D. Salmon).

except as provided in Paragraphs 4, 5 and 12.

2. In consideration of $5,000, and in order to [permit the Bank to continue its mortgage and mortgage servicing business, the Bank shall acquire at closing of the Keystone Transaction (or at such later date determined by the Bank) up to 96.9% of the issued and outstanding shares of the company, with any remaining stock interest being held by Salmon pursuant to the terms and conditions of a shareholders agreement to be executed between the Bank and Salmon and which shall, in addition to other reasonable terms and conditions to be agreed upon by the parties, prohibit the further transfer of stock and provide for a pledge of the stock to the Bank to assure compliance with such covenant but, providing, at a minimum, that Salmon, as the remaining stockholder of the Company as described above, grants to the Bank a credit for sums due him as a stockholder of the Company after the Bank acquires stock pursuant to this paragraph for payments made to the Selling Shareholders and/or the Phoenix Shareholders and or White pursuant to the Keystone Transaction.

. . .

4. The Selling Shareholders shall pay to the Bank by check (subject to collection) of a sum of $195,000 which sum represents the reconciliation of the purchase price pursuant to the terms of the Purchase Agreement and the LOI. The Selling Shareholders shall also pay to White the sum of $8,000 for his share of any such reconciliation. The Company and all of the shareholders of the Company hereby consent to such payments, and release the Selling Shareholders from any further liability therefor once such payment is made.

. . .

12. The reconciliation amount due to the Bank and White under Paragraphs 4 and 5 hereof shall be paid to the Bank and White by the Selling Shareholders and the Phoenix Shareholders, as applicable, whether or not the Keystone Transaction proceeds, at the earlier to occur of the Keystone Transaction closing date or thirty days from the date hereof.

However, the parties did not execute the Memorandum of Understanding until March 12, 1999. Cert. of Counsel, Exh. 22; First Derivative Compl. ¶ 34. While defendants contend that the delay in the execution of the Memorandum did not negatively impact the Keystone transaction, plaintiff Stephen Brand testified that, after March 1st, the pace of the transaction slowed and Keystone's interest in the transaction subsided. Pls.' Mot. in Resp. to Defs.' Mot. for Summ. J., Exh. I at 95 (dep. of S. Brand) ("As of March we still had a chance to close the transaction, but the likelihood of closing was dropping every day that we went through March."). Yet, the parties' continued to proceed with the transaction. In a letter dated March 22, 1999, the Bank sought approval from the Federal Reserve Board, and Keystone's Board of Directors voted on March 25, 1999 to authorize its Executive Committee to determine FBMC's value. Cert. of Counsel, Exhs. 24 and 26. In addition, Don Salmon continued to negotiate his employment contract with Keystone. *Id.* at Exh. 28.

On April 20, 1999, Mike Drury, Executive Vice President of Keystone Mortgage, notified Don Salmon that Keystone was no longer interested in pursuing the deal. Ben Rooke, Vice Chairman, Corporate Secretary, Executive Vice President and General Counsel of Keystone in charge of mergers and acquisitions, testified that there was no single cause for this decision.

Cert. of Counsel, Exh. 8 at 33 (dep. of B. Rooke). According to Rooke, "[t]his was a transaction where I was more brake than accelerator." *Id.* Rooke "didn't see in this deal so much value that [he] had to rush a structure." *Id.* On May 14, 1999, Stephen Brand resigned from the FBMC's Board of Directors. FBMC filed for bankruptcy in July 1999.

In April 2000, the Selling Shareholders filed a Derivative Complaint for Declaratory Damages. This derivative complaint asserted breach of fiduciary duty and negligence claims against the Bank, Young, Rapp, and Salmon. This court dismissed the complaint without prejudice for failing to make a demand to FBMC's Board of Directors. On August 15, 2000, the Bank filed a complaint in the Philadelphia Court of Common Pleas against the plaintiffs in this action alleging breach of contract, fraud, and negligent misrepresentation. The selling shareholders responded to the state court action by filing a counterclaim on February 16, 2001. The Common Pleas Court stayed the state court action pending the bankruptcy court's decision.

In July 2001, the plaintiffs filed the second derivative complaint which asserted the same claims as the first derivative complaint but also included claims against Madonna as well as an additional claim of interference with prospective economic advantage against all defendants. This court again dismissed the complaint without prejudice because the independent investigator had not issued his report regarding the merits of the action. On November 8, 2001, Steven Angstreich, a lawyer retained by the defendants' law firm, issued his report regarding the plaintiffs' allegations against the defendants. In his report, Angstreich noted that he served as a "committee of one" because none of FBMC's directors were independent as all of the directors were either named plaintiffs or defendants in this action. Cert. of Counsel, Exh. 34 at 1. Angstreich interviewed Don Salmon, Jere Young, George Rapp, and Christopher Heise. The investigator attempted to meet with Stephen Brand or another representative of the plaintiffs but was unsuccessful. Angstreich concluded that FBMC "had insufficient cash, was highly leveraged and had inadequate collateral. Those factors were extant immediately upon the merger concluding and were not the result of mismanagement or improper actions." *Id.* at 19. Angstreich did not find "there is any viable claim that should be brought against the directors of the corporation or First Republic and, as such, neither company should undertake to pursue the claims advanced by the shareholders in the presently pending derivative action." *Id.* Young, the sole remaining director of FBMC, adopted the report and elected not to pursue the litigation.

In their third derivative complaint, the plaintiffs allege that the Bank defendants [13] breached their fiduciary duty as well as their undivided duty of loyalty by frustrating the sale of FBMC's assets to Keystone Bank when the company was on the verge of bankruptcy. In addition, the plaintiffs bring claims for interference with prospective advantage (Count II), and negligence (Count III). Plaintiffs also seek a declaratory judgment disallowing or subordinating First Republic's claims in the pending bankruptcy action (Count IV). In its counterclaim, the Bank asserts that the individual plaintiffs, as shareholders of Fidelity, breached the LOI and Definitive Agreement involving the initial merger transaction. Count I of the counterclaim

---

**13.** Plaintiffs and defendant Don Salmon have reached a settlement agreement and he is no longer a party to this litigation.

alleges that the plaintiffs breached the merger agreements when they removed more money from Fidelity's bank accounts than was permitted and contemplated under the initial merger agreements, and materially misrepresented Fidelity's financial condition. In Count II, the Bank contends that it is entitled to the $195,000.00 that it overpaid in the initial merger transaction involving Fidelity and Phoenix as the parties agreed to in the memorandum of understanding. In addition, the Bank brings claims of fraudulent and negligent representation.

## B. Discussion

### A. Legal Standard

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56(c). At the summary judgment stage, the court does not weigh the evidence and determine the truth of the matter. Rather, it determines whether or not there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In making this determination, all of the facts must be viewed in the light most favorable to, and all reasonable inferences must be drawn in favor of, the non-moving party. *Id.* at 256, 106 S.Ct. 2505.

The moving party has the burden of showing there are no genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Mathews v. Lancaster General Hosp.*, 87 F.3d 624, 639 (3d Cir. 1996). In response, the non-moving party must adduce more than a mere scintilla of evidence in its favor, and cannot simply reassert factually unsupported allegations contained in its pleadings. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505; *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548; *Williams v. Borough of West Chester,* 891 F.2d 458, 460 (3d Cir.1989). Rather, there must be evidence on which a jury could reasonably find for the nonmovant. *Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. 2505. "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

### B. Defendants' Motion for Summary Judgment

#### 1. Breach of Fiduciary Duty and Negligence

In *Cuker v. Mikalauskas*, the Pennsylvania Supreme Court held that the business judgment rule permits the board of directors of a Pennsylvania corporation to terminate derivative lawsuits brought by minority shareholders. 547 Pa. 600, 692 A.2d 1042, 1045 (1997). As the Pennsylvania Supreme Court described the doctrine in *Cuker,* the business judgment rule "insulates an officer or director of a corporation from liability for a business decision made in good faith if he is not interested in the subject of the business judgment, is informed with respect to the subject of the business judgment to the extent he reasonably believes to be appropriate under the circumstances, and rationally believes that the business judgment is in the best interests of the corporation." *Cuker v. Mikalauskas,* 547 Pa. 600, 692 A.2d 1042, 1045 (1997). This rule "reflects a policy of judicial noninterference with business decisions of corporate managers, presuming that they pursue the best interests of their

corporations, insulating such managers from second-guessing or liability for their business decisions in the absence of fraud or self-dealing or other misconduct or malfeasance." *Id.* at 1046.

In finding that the business judgment rule applied to a board's decision to terminate a derivative action, the *Cuker* court specifically adopted sections 7.02–7.10, and section 7.13 of the American Law Institutes' Principles of Corporate Governance. According to these principles, a shareholder does not have standing to bring an action on behalf of a corporation without first making demand on the board of directors to pursue the action. 2 A.L.I. Principles of Corp. Gov. § 7.03. *See also Cuker*, 692 A.2d at 1049–50. If the board rejects the demand, "a court must examine the circumstances surrounding the decision[ ] in order to determine if the conditions warrant application of the business judgment rule." *Cuker*, 692 A.2d at 1048. When evaluating a board's decision to terminate a derivative action, courts should consider the following factors:

> whether the board or its special litigation committee was disinterested, whether it was assisted by counsel, whether it prepared a written report, whether it was independent, whether it conducted an adequate investigation, and whether it rationally believed its decision was in the best interests of the corporation (i.e., acted in good faith). If all of these criteria are satisfied, the business judgment rule applies and the court should dismiss the action.

*Id.* In addition, courts should examine the composition of the board or special litigation committee which, under section 7.09(a) of the ALI Principles, "should be composed of two or more persons, no participating member of which was interested in the action, and should as a group be capable of objective judgment in the circumstances." However, if the board or committee "substantially complied with" the procedures specified in section 7.09(a), "or any material departures therefrom were justified under the circumstances," then dismissal is appropriate. 2 A.L.I. Principles of Corp. Gov. § 7.08.

█ Defendants claim that FBMC's refusal to bring suit is based on the recommendation of the independent "committee of one," Steven Angstreich. In response, plaintiffs argue that the committee was neither independent nor investigative. According to the plaintiffs, the Angstreich report is unreliable because the defendants' law firm hired the "committee of one," Angstreich did not interview any of the plaintiffs, Angstreich was not assisted by separate counsel, and an interested director adopted the report's recommendations and rejected the demand.[14] Although a committee should consist of at least two disinterested individuals and be assisted by counsel, section 7.08(b) allows for departures from these procedural standards if the departures are justified under the circumstances. Because all the directors were named in the litigation either as plaintiffs or defendants and FBMC had filed for bankruptcy, the circumstances

---

**14.** Not all directors named in a derivative action are considered "interested" directors under the Principles of Corporate Governance. Section 1.23(c) of the principles provides that a director is not interested if liability is asserted against the director "based only on the fact that the director approved of or acquiesced in the transaction or conduct that is the subject of the action . . . ." In this case, plaintiffs allege that the individual defendants refused to approve the Keystone transaction until payments or other forms of remuneration were made to First Republic Bank. Therefore, the individual defendants were not merely nominal defendants but were "interested" directors as defined by section 1.23(c).

justified hiring only one outside attorney to conduct the investigation. Although the defendants' law firm hired the attorney, this fact alone does not undermine Angstreich's conclusions. Many courts have allowed interested directors to appoint an independent committee to review a derivative action. *See e.g., Lewis v. Anderson,* 615 F.2d 778, 783 (9th Cir. 1980) ("[T]he fact that the independent committee members were appointed by interested directors is an 'inescapable' aspect of 'the corporation's predicament.'"); *Stein v. Bailey,* 531 F.Supp. 684, 693 (S.D.N.Y.1982) ("If the Court were to adopt plaintiff's reasoning, which suggests that interested directors be excluded from a meeting held to appoint an independent committee, the Court can envision a situation whereby too few directors are present to constitute a quorum. Since this would undermine the efficacy of the rule, plaintiff's first point is rejected."); *Spiegel v. Buntrock,* 571 A.2d 767, 776 (Del.1990) (" Thus, even in a demand-excused case, a board has the power to appoint a committee of one or more independent disinterested directors to determine whether the derivative action should be pursued or dismissal sought."). As the Delaware Supreme Court concluded in *Zapata v. Maldonado,* 430 A.2d 779 (Del.1981), "[t]o allow one shareholder to incapacitate an entire board of directors merely by leveling charges against them gives too much leverage to dissident shareholders." *Id.* at 785. Although plaintiffs argue that the Angstreich report is incomplete because he did not interview the plaintiffs and failed to inspect their documents, the evidence shows that Angstreich attempted to interview the plaintiffs. However, these interviews never occurred because Angstreich and plaintiffs' counsel could not agree to the interview process or the procedure for providing supportive documents.[15] Although Angstreich was not able to interview all the interested parties, he did interview all of the Bank defendants as well as de-

---

15. Angstreich writes in his report:

> Efforts were made to meet with Stephen Brand or another representative of the Plaintiffs through communication with David Braverman, counsel for the Plaintiffs. I offered Mr. Braverman the opportunity to provide documents he believed supported the allegations of his clients' Complaint. Similar offers were made to other counsel and I was provided with documents from them. Mr. Braverman declined to provide the documents in advance suggesting that he would hand them to me as I questioned Mr. Brand. I explained that his suggestion as to procedure was unacceptable and not the way I wanted to conduct the interview. As a result, I offered to inspect the documents in his office prior to the interview. Mr. Braverman informed me that it would take three weeks to review the documents he thought response to his clients' Complaint. I offered to bring additional people to assist in the review so that I could have pertinent ones copied for use during the interview. Mr. Braverman did not believe such a process was appropriate. He continued to suggest that as I asked a question during the interview, he would hand me the relevant document. I viewed such a process as inhibiting the interview and declined his offer. Notwithstanding good faith efforts to reach an accommodation, neither Mr. Brand nor any other Plaintiff has been interviewed.

Cert. of Counsel, Exh. 34 at 4. According to Angstreich, he attempted to accommodate the demands of plaintiffs' counsel without sacrificing the integrity of his investigation. Although Angstreich acknowledges that the plaintiffs may have provided further information that could modify or alter his conclusions, he notes that the "documentation that has been provided to me together with the interviews conducted are sufficient for me to render this report ....'' Because Angstreich attempted to interview the plaintiffs and examine their supportive documents, the report is no less credible because plaintiffs' counsel would not consent to the investigator's interview request.

fendant Don Salmon. The court finds that Angstreich's investigation was thorough and complete. Angstreich operated as an independent committee and reported his findings to the only remaining director—Jere Young. Young, as the sole director of a bankrupt corporation, adopted the report's recommendation that the selling shareholders did not have a viable claim and the corporation refused the demand. Any deviations from the ALI standards in establishing the committee were justified under the circumstances, and the business judgment rule shields the defendants from liability for not pursuing the derivative action.[16]

■ Plaintiffs argue that the business judgment rule does not apply because there is evidence of self-dealing and bad faith on the part of the defendants in frustrating the Keystone deal. However, the only evidence of bad faith and self-dealing are the plaintiffs' bare assertions that defendants thwarted the sale of FBMC's assets. While plaintiffs assert that the Chairman of First Republic Bancorp "nixed the deal" following the February 14th meeting, the evidence before the court shows that the parties circulated drafts of the Memorandum of Understanding following that meeting, and the Bank sought Federal Reserve Board approval for the Keystone Transaction in a March 22, 1999 letter. Although plaintiffs claim that Keystone was unable to conduct due diligence because of the delay in negotiating the Memorandum of Understanding,

Keystone continued to pursue FBMC as noted by the March 25, 1999 Board of Director's vote to authorize its Executive Committee to determine FBMC's value. In addition, in mid-March FBMC's president Don Salmon continued to negotiate his employment agreement with Keystone. Finally, Keystone's Executive Vice President Ben Rooke, testified that there was no single reason for Keystone's decision to terminate negotiations with FBMC. Therefore, there is no genuine issue of material fact as to whether defendants behaved in bad faith while negotiating the Keystone transaction.

■ Even if the business judgment rule did not shield the directors from liability for not pursuing the derivative action, the plaintiffs' underlying claim lacks merit. Plaintiffs claim that First Republic sought greater compensation out of the Keystone transaction which delayed the deal and caused Keystone to walk away. Plaintiffs also claim that Keystone ended negotiations with FBMC because "they did not believe the shareholders had made peace." Pls.' Mot. for Partial Summ. J., Exh. A at 78 (dep. of D. Salmon). As FBMC president Don Salmon testified, Keystone "knew that there was contention among various shareholder groups and they didn't want to spend a lot of time and effort and money pursuing a transaction that wasn't going to happen. They wanted the shareholders to be in agreement and as one. And they wanted to meet with the shareholders so they could assess for themselves that that was the case." *Id.* at 36.

---

**16.** Plaintiffs argue that because they contest that the independent committee meets the *Cuker* criteria, this court cannot conclude whether the business judgment rule has any material impact in the action. *See* Pls.' Resp. to Defs.' Mot. for Summ. J. at 11. Plaintiffs point to the Pennsylvania Supreme Court's reasoning that "[u]ntil factual determinations are made in regard to these disputed issues, a trial court cannot conclude whether or not the business judgment rule requires dismissal of the action." *Cuker,* 692 A.2d at 1048 n. 2. However, a plaintiff must do more than dispute a fact to survive summary judgment. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505; *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548; *Williams v. Borough of West Chester,* 891 F.2d 458, 460 (3d Cir.1989).

Although plaintiffs contend that the Bank's actions caused Keystone to withdraw the offer, the evidence before this court does not support these allegations.[17] As previously discussed, the evidence shows that the parties began negotiating the Memorandum of Understanding following the February meeting. In the next month, First Republic Bank wrote to the Federal Reserve Board seeking approval for the merger. Throughout the month of March, Keystone continued to negotiate an employment contract with Salmon. Keystone's Board of Directors voted to determine FBMC's value. However, as Ben Rooke testified, Keystone's representative in charge of mergers and acquisitions, Keystone chose not to rush negotiations. Apart from plaintiffs' allegations, there is no evidence before the court that the defendants' actions extinguished the Keystone transaction. Therefore, there are no genuine issues of material fact and defendants are entitled to summary judgment on Counts I and III of the plaintiffs' complaint.

### 2. Interference with Prospective Economic Advantage

■ Plaintiffs also allege that First Republic Bank, Jere Young, George Rapp, and Harry Madonna interfered with prospective economic advantage by obstructing the consummation of the Keystone transaction. To make out a claim for interference with prospective economic advantage, plaintiffs must prove:

(1) the existence of a prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occurrence of actual damages caused by the defendant's conduct.

*Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 412 A.2d 466, 471 (1979); *Glenn v. Point Park College*, 441 Pa. 474, 272 A.2d 895, 898 (1971). As the Third Circuit noted, "[t]he Pennsylvania courts have referred to a 'prospective contractual relation' as 'something less than a contractual right, something more than a mere hope.'" *Orlando v. Billcon Intern., Inc.*, 822 F.2d 1294, 1299 (3d Cir.1987) (citing *Thompson*, 412 A.2d at 471). According to the Pennsylvania Supreme Court, "anything that is prospective in nature is necessarily uncertain. We are not here dealing with certainties, but with reasonable likelihood or probability. This must be something more than a mere hope or the innate optimism .... [T]he rule to be applied is that the [plaintiff] may recover when the jury is satisfied that but for the wrongful acts of the defendant it is reasonably probable that the plaintiff would have effected the sale ...." *Glenn*, 272 A.2d at 898.

■ Plaintiffs have offered no evidence to establish that "but for" the defendants' actions, Keystone would have purchased

---

17. As the independent investigator concluded, the Bank's desire for greater compensation did not affect the Keystone transaction. Angstreich testified,

> my discussion with Mr. Heise and Mr. Salmon as it related to the claim against Republic for delaying and effectively killing the Keystone acquisition led me to the conclusion that everybody recognized that the parties inter se had to reach an agreement in order to close the deal with Keystone,

that whether or not Republic's demand for an extra million dollars was justified, the deal was not dead. Mr. Heise made that clear to me and Mr. Salmon made that clear to me and that was an important fact, because Mr. Salmon, I thought, had an interest in pinning the Keystone deal of Republic since was also a target of having caused the Keystone deal to tank as well. Cert. of Counsel, Exh 33 at 44–45 (dep. of S. Angstreich).

FBMC. In their complaint, plaintiffs allege that the defendants interfered with the Keystone transaction by refusing to vote in favor of the deal at the February 10, 1999 Board of Directors meeting, and "nixing" the deal following the February 14th meeting because the defendants were unhappy with the Bank's remuneration. However, the Keystone transaction progressed following the February 14th meeting until Keystone withdrew its offer on April 20. Keystone's Ben Rooke testified that he did not know why the transaction failed to close. Cert. of Counsel, Exh. 8 at 32 (dep. of B. Rooke). According to Rooke, he intentionally delayed closing the deal. *Id.* at 33. Aside from the plaintiffs bare allegations, there is no evidence to suggest that the Keystone transaction would have occurred but for the defendants' action. Therefore, defendants are entitled to summary judgment on Count II of plaintiffs' complaint.[18]

---

18. In addition, plaintiffs allegation that Harry Madonna interfered with FBMC's prospective economic advantage fails because it is time barred. Plaintiffs claim that Madonna, on February 17, 1999, terminated the February 14th shareholder deal, which, in turn, prevented Keystone and FBMC from closing the Keystone transaction by February 28, 1999. Under Pennsylvania law, the statute of limitations for interference with prospective economic advantage and negligence is two years. *See* 42 Pa.C.S.A. § 5524(3) and (7). Although the plaintiffs first named Madonna in the second derivative complaint filed on July 24, 2001, more than two years beyond the alleged tort, plaintiffs contend that the amended pleading relates-back to the date of the original pleading pursuant to Federal Rule of Civil Procedure 15(a). Under Federal Rule of Civil Procedure 15(c),

> [a]n amendment of a pleading relates back to the date of the original pleading when
> . . .
> (2) the claim or defense asserted in the amended pleading arose out of conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, or,
> (3) the amendment changes the party or the naming of the party against whom a claim is asserted if the foregoing provision (2) is satisfied and, within the period provided by Rule 4(m) for service of summons and complaint, the party brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, *and* (b) knew or should have known that, but for the mistake concerning the identity of the proper party, the action would have been brought against the party.

Fed. R. Civ. Pro. 15(c) (emphasis added). "[C]ourts interpret 15(c)(3) as imposing three conditions, all of which must be met for a successful relation back of an amended complaint that seeks to substitute newly named defendants." *Singletary v. Pennsylvania Dept. of Corrections*, 266 F.3d 186, 194 (3d Cir. 2001). The defendants do not dispute that the plaintiffs' claims against Madonna arose "out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading"—therefore, the plaintiffs' amended complaint meets the first condition under Rule 15(c)(2). Rule 15(c)(3)(A) "has two requirements, notice and the absence of prejudice, each of which must be satisfied." *Urrutia v. Harrisburg County Police Dept.*, 91 F.3d 451, 458 (3d Cir.1996). Plaintiffs claim that Madonna had notice because of plaintiffs' pleadings in a state court action involving the same parties. *See* Pls.' Resp. to Mot. for Summ. J. at 13. According to the plaintiffs, the Fidelity shareholders filed a counterclaim in the state action on February 20, 2001 asserting claims against Madonna for his role in the failure of the Keystone Transaction. Assuming arguendo that Madonna had notice of plaintiffs' claims, the plaintiffs fail to satisfy the third condition of 15(c) which is that the newly named party must have known, or should have known, that "but for a mistake" made by the plaintiff concerning the newly named party's identity, "the action would have been brought against" the newly named party in the first place. Plaintiffs claim that they amended the complaint as soon as they learned the identity of the actors at First Republic Bank. However, the plaintiffs knew Madonna's identity in February 2001 when they filed the counterclaim yet failed to amend the complaint until July 2001. Therefore, Madonna could not have known that, "but for a mistake," the plaintiffs

### 3. The Bank's Counterclaim for Breach of Contract

■ The Bank also seeks summary judgment on Count II of the counterclaim seeking $195,000 in damages for plaintiffs' breach of contract. In order to make out a claim for breach of contract, defendants must establish the following four elements: 1) existence of a contract between the plaintiffs and defendants; 2) the essential terms of the contract; 3) a breach of the duty imposed by the contract; and 4) that damages resulted from the breach. *See General State Authority v. Coleman Cable & Wire Co.*, 27 Pa.Cmwlth. 385, 365 A.2d 1347, 1349 (1976). The Bank avers that plaintiffs breached the Memorandum of Understanding which the selling shareholders and the Bank signed on March 22, 1999. Specifically, the Bank charges that the plaintiffs breached paragraph four of the Memorandum of Understanding which provides:

> [t]he Selling Shareholders shall pay to the Bank by check (subject to collection) of a sum of $195,000 which sum represents the reconciliation of the purchase price pursuant to the terms of the Purchase Agreement and the LOI.... [Fidelity] and all of the shareholders of [Fidelity] hereby consent to such payments, and release the Selling Shareholders from any further liability therefor once such payment is made.

Cert. of Counsel, Exh. 22 at ¶ 4. This section of the Memorandum has its origin in the Letter of Intent and Definitive Agreement signed during the initial merger transaction between Phoenix and Fidelity. Under the initial merger agreements, accountants would determine the actual net worth of Fidelity following the merger. Because the accountants' findings indicated that selling shareholders overstated Fidelity's net worth at closing and the purchase price was $415,628.00 less than the other parties paid, the Memorandum of Understanding addressed this discrepancy. Although the Memorandum of Understanding concerned the failed Keystone Transaction, paragraph twelve of the document provided that

> [t]he reconciliation amount due to the Bank and White under Paragraphs 4 and 5 hereof shall be paid to the Bank and White by the Selling Shareholders and the Phoenix Shareholders, as applicable, *whether or not the Keystone Transaction proceeds*, at the earlier to occur of the Keystone Transaction closing date or thirty days from the date hereof.

*Id.* at ¶ 12 (emphasis added). All the parties signed the Memorandum of Understanding. *Id.*

Plaintiffs first argue that the contract is not binding because the parties failed to fully execute the Memorandum of Understanding. Although the defendants have produced the Memorandum of Understanding signed by all the parties including the selling shareholders' representative Stephen Brand, *id.*, plaintiffs allege that the parties did not execute the addendum to the Memorandum. Pls.' Resp. to Defs.' Mot. for Summ. J., Exh. I at 85 (dep. of S. Brand). Therefore, the Memorandum does not constitute a contract.

Second, plaintiffs assert that the Memorandum of Understanding is unenforceable because the Bank breached the agreement. Although the Memorandum provides that the plaintiffs shall pay $195,000 regardless

---

intended to name him as a defendant in the derivative action. Even if the plaintiffs could establish that but for Madonna's actions Keystone would have purchased FBMC, defendant Madonna is entitled to judgment as a matter of law because the claim is time barred.

of the outcome of the Keystone transaction, plaintiffs argue that there are issues of material fact as to whether the Bank's wrongful conduct caused the unraveling of the Keystone transaction. According to the plaintiffs, "the [Memorandum of Understanding] does not include, as a contingency, a party's intentional interference with the closing of the deal." Even though the parties signed the Memorandum of Understanding following the February 14th meeting, the Bank sought approval from the Federal Reserve in March, the Keystone Board of Directors voted to determine FBMC's value, and FBMC's president Don Salmon continued to negotiate his employment contract with Keystone, plaintiffs contend that the Bank's conduct before these events caused Keystone to withdraw the offer to purchase FBMC.

■ These arguments, however, fail to defeat summary judgment. The signed Memorandum of Understanding is explicit—the plaintiffs agreed to pay the defendants $195,000. Although the evidence shows that all the parties executed the Memorandum of Understanding, plaintiffs argue that the document was not fully executed. To support this allegation, plaintiffs point to the testimony of plaintiff Brand. In response to a question regarding the signed Memorandum of Understanding, Brand testified, "I believe I differ with everyone. I don't believe that you have a fully executed Memorandum of Understanding with amendments executed by all parties dated today. As I sit here I don't believe you have it . . . ." Pls.' Resp. to Defs.' Mot. for Summ. J., Exh. I at 85 (dep. of S. Brand). However, a difference of opinion does not defeat a motion for summary judgment. A non-moving party must do more than simply reassert factually unsupported allegations to show that there exists a genuine issue of material fact. *Anderson*, 477 U.S. at 249, 106 S.Ct.

2505; *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548; *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir.1989). In addition, the evidence overwhelmingly shows that the Keystone transaction continued to progress until Keystone ended negotiations. As noted, there is no evidence to support plaintiffs' allegations of wrongful conduct. Therefore, there exist no genuine issues of material fact, and the Bank is entitled to summary judgment on its breach of contract counterclaim.

### C. Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs seek summary judgment on Count I (breach of contract), Count II (breach of contract), Count III (fraudulent misrepresentation) and Count IV (negligent misrepresentation) of the Bank's counterclaim. As previously discussed, the Bank is entitled to summary judgment on Count II of its counterclaim. The court will address the remaining counterclaims seriatim.

### 1. Count I—Breach of Contract

■ The Bank argues that the selling shareholders breached the Letter of Intent and Definitive Agreement. As noted, the Bank must establish the following elements in order to make out a breach of contract claim against the selling shareholders: 1) existence of a contract to between the plaintiffs and defendants; 2) the essential terms of the contract; 3) a breach of the duty imposed by the contract; and 4) that damages resulted from the breach. *See General State Authority v. Coleman Cable & Wire Co.*, 27 Pa. Cmwlth. 385, 365 A.2d 1347, 1349 (1976). When interpreting the terms of a contract, "[i]t is well established that the intent of the parties to a written contract is to be regarded as being embodied in the writing itself, and when the words are clear and

unambiguous the intent is to be discovered only from the express language of the agreement." *Steuart v. McChesney,* 498 Pa. 45, 444 A.2d 659, 661 (1982). "[W]here the language is clear and unambiguous, the focus of interpretation is upon the terms of the agreement as manifestly expressed, rather than as, perhaps, silently intended." *Id.*

The Bank alleges that the plaintiffs breached the following provision of the LOI and Definitive Agreement:

> Immediately prior to the Closing of the Purchase Agreement, [Fidelity] may distribute to the Selling Shareholders all but $500,000 in cash. Each of [Fidelity] and Phoenix shall provide, in addition to the $500,000.00, sufficient cash to make the next succeeding commission payroll for their respective employees (the "Distribution").

Pls.' Mot. for Summ. J., Exh. A at ¶ 4. The Bank contends that the actual closing balance was $312,000 after deducting payroll ($130,000) and other expenses ($170,-000). Bank's Resp. to Pls.' Mot. for Summ. J., Exh. N. However, the cash balance as of April 30, 1998 was over $600,000. *Id. See also* Cert. of Counsel, Exh. 34, at 8 ("The documentation shows that there was $611,000 of cash availability at the time the merger closed and that the closing document only required $500,000."). Although the LOI required Phoenix and Fidelity to provide sufficient cash to satisfy the succeeding *commission* payroll, the $130,000 deduction satisfied payroll for Phoenix *salary* employees rather than commission employees. Cert. of Counsel, Exh. 34, at 7–8. In addition, the Angstreich report found that FBMC's cash flow problems were, in part, attributable to a $26,000 shortfall in the Phoenix account. Thus, the Bank has failed to present any evidence that the selling shareholders breached this provision of the LOI.

The Bank also claims that the selling shareholders failed to ensure a $500,000 line of credit. According to the Bank, the selling shareholders breached the following provision of the LOI: "The $4,000,000.00 net worth is an estimated figure and is conditioned on a Summit Bank term loan of not less than $7,000,000.00 to be secured by [Fidelity's] Mortgage Servicing Rights, among other collateral." The Bank claims that the Summit Bank loan included a $500,000 line of credit that FBMC would rely on to fund its daily operations. This line of credit was contingent on FBMC meeting two separate loan to value covenants. Because of the drop in Fidelity's servicing portfolio, FBMC failed to meet Summit's requirements and was unable to access this line of credit.

Although the Bank alleges the selling shareholders breached the LOI because Fidelity's servicing portfolio was insufficient to meet the loan covenants, the Bank has failed to establish that the selling shareholders' conduct caused the decline in the servicing portfolio. As the Angstreich report concluded, the decline in Fidelity's servicing portfolio was due to a drop in mortgage rates. The evidence clearly shows that economic factors, not the selling shareholders, are responsible for FBMC's inability to access the $500,000 line of credit.

The Bank has also failed to establish that the selling shareholders breached the LOI and Definitive Agreement by "[r]epresenting and warranting that there had been no material change in the financial condition of [Fidelity] from the date of the execution of the letter of intent when, in fact, both the net worth of [Fidelity] and the value of the Servicing Portfolio had decline materially." Defs.' Answer and Counterclaim, ¶ 34(c). The LOI and Definitive Agreement constituted the entire

agreement between the parties and superseded "any prior understandings, agreements or representations by or among the parties, written or oral, to the extent they related in any way to the subject matter hereof." Pls.' Mot. for Partial Summ. J., Exh. A at ¶ 6(c). The LOI provided that the Phoenix/Fidelity merger was conditioned upon, among other things, "the accuracy of the representations and warranties contained in the Purchase Agreement as of the Closing Date and the absence of any material adverse change in the business, financial condition, property or prospects of (i) [Fidelity] (other than as may be caused by general economic conditions of the mortgage banking industry) and of (ii) Phoenix)." *Id.* at ¶ 11(b). According to the Bank, Fidelity lost approximately $51,000,000 of mortgage servicing rights while capturing only approximately $21,000,000 in mortgage servicing rights through refinancing originations in the four months prior to the closing. As the Angstreich report concluded, FBMC suffered these financial difficulties because: 1) "There was a substantial decline in interest rates shortly after the merger which spurred significant refinancings and with it a significant decrease in the number of mortgages being serviced by the company;" and 2) "As interest rates declined and as mortgages were being refinanced, there was a need to revalue the portfolio. This impairment reduced the balance sheet asset as the company was required to book the servicing portfolio at the lower of cost or market and, since the market was lower than cost, the portfolio was devalued." Cert. of Counsel, Exh. 34 at 10. Due to the general economic conditions of the mortgage industry (lower interest rates), Fidelity suffered a "run-off" of loans which lowered the servicing revenues of the

merged entity. *Id.* at 6. Therefore, Fidelity did not suffer a material adverse change in business operations except for the run-off in the mortgage servicing portfolio due to the low interest rates and the general economic condition of the mortgage industry. There exists no genuine issue of material fact and plaintiffs are entitled to summary judgment on Count I of the counterclaim.

### 2. Fraudulent Misrepresentation

The Bank alleges that the selling shareholders fraudulently misrepresented the value of Fidelity's servicing portfolio and failed to disclose that Fidelity had insufficient collateral to secure the necessary operating loans. Under Pennsylvania law, the statute of limitations for fraud is two years. 42 Pa. Cons.Stat. Ann. § 5524. The selling shareholders allegedly made the fraudulent misrepresentation in 1998;[19] yet, the Bank filed its counterclaim in this court July 19, 2002. Although the Bank filed its state court action in August 2000, "[it is well settled that the commencement of an action in state court has no effect on the running of the statute with respect to an action filed later in federal court." *Price v. United States,* 466 F.Supp. 315, 318 (E.D.Pa.1979) (citing *Falsetti v. Local Union No. 2026, United Mine Workers,* 355 F.2d 658, 662 (3d Cir. 1966)). Although the Bank argues that all of the counterclaims should proceed to promote judicial efficiency and fairness, the Bank filed its fraudulent misrepresentation claim beyond the time period allowed by statute. Therefore, Count III of the Bank's counterclaim is time barred and the plaintiffs are entitled to summary

---

**19.** The Bank discovered the alleged injury after the Palitz audit in October 1998. *See City of Philadelphia v. Lead Indus. Ass'n, Inc.,* 994 F.2d 112, 121 (3d Cir.1993) (discussing Pennsylvania's discovery rule).

judgment for this counterclaim.[20]

### 3. Negligent Misrepresentation

The Bank also alleges that the selling shareholders negligently misrepresented the value of Fidelity's servicing portfolio. A two-year limitation applies to the Bank's negligent misrepresentation claim. 42 Pa. Cons.Stat. Ann. § 5524(7). Because the Bank filed its counterclaim more than two years following the alleged misconduct, Count IV of the plaintiffs complaint is time barred.

### III. Conclusion

For the foregoing reasons, defendants' motion for summary judgment is granted and plaintiffs' motion for partial summary judgment is granted as to Counts I, III, and IV. An appropriate Order follows.

### ORDER

**AND NOW,** this 29th day of July, 2003, upon consideration of Defendants' Motion for Summary Judgment, Plaintiffs' Motion for Partial Summary Judgment, and the responses thereto, it is hereby **ORDERED** that the Defendants' motion is **GRANTED** and Plaintiffs' motion is **GRANTED IN PART** as to Counts I, III, and IV. The case is closed for statistical purposes.

---

[20]. Because the Bank cannot establish by clear and convincing evidence that the plaintiffs committed fraud, plaintiffs would be entitled to summary judgment even if the Bank had filed this claim within the statute of limitations. In order to establish fraudulent misrepresentation, a complainant must prove by clear and convincing evidence 1) a misrepresentation; 2) a fraudulent utterance thereof; 3) an intention by the maker that the recipient will thereby be induced to act; 4) justifiable reliance by the recipient upon the misrepresentation; and, 5) damage to the recipient as the proximate result. *Tunis Bros. Co., Inc. v. Ford Motor Co.,* 952 F.2d 715, 731 (3d Cir. 1992). Although the Bank and its representatives may speculate that the plaintiffs intentionally misrepresented the value of the servicing portfolio in order to induce the Bank to purchase the company, mere conjecture fails to establish the elements of fraud by clear and convincing evidence.