Charles LEMENESTREL, Genevieve Lemenestrel–Manas and Superior Group, Inc.

v.

William G. WARDEN, III, William G. Warden, IV, Walter E. Bachman, III, Louis T. Cullen, Raymond B. Langton and Superior Group, Inc.

Appeal of: Charles Lemenestrel and Genevieve Lemenestrel–Manas.

Superior Court of Pennsylvania.

Argued Sept. 16, 2008.
Filed Dec. 31, 2008.
Reargument Denied March 2, 2009.

Louis J. Sinatra, Philadelphia, for appellants.

Marc J. Sonnenfeld, Philadelphia, for Superior Group, appellee.

BEFORE: BENDER, DONOHUE and FREEDBERG, JJ.

OPINION BY BENDER, J.:

¶ 1 Charles LeMenestrel and Genevieve LeMenestrel–Manas (collectively, the "LeMenestrels"), minority shareholders and siblings, and Superior Group, Inc. (the "Company"), who are the plaintiffs in this case, appeal from the November 9, 2007 order that sustained the preliminary objections of the defendant directors, William G. Warden, III ("Warden III"), William G. Warden, IV ("Warden IV"), Walter E. Bachman, III ("Bachman" or "Bachman III"), Louis T. Cullen ("Cullen"), Raymond B. Langton ("Langton"), and the Company, and dismissed with prejudice the shareholders' derivative suit filed by the plaintiffs. The Honorable Charles B. Burr, II, who presided over this case, determined that the special litigation committee (the "Committee") formed by the Company's board of directors in response to a demand letter from the LeMenestrels (the "Demand Letter") was disinterested, independent, impartial and adequately informed in reaching its good faith conclusion that it was not in the best interests of the Company to proceed with the LeMenestrels' shareholders' derivative suit. In reaching his decision, Judge Burr made extensive findings of fact and relied largely on guidelines for judicial review of the right of a corporation to terminate shareholder derivative litigation as set forth in The American Law Institute's *Principles of Corporate Governance: Analysis and Recommendations* ("ALI Principles"), particularly sections 7.07–7.10 and 7.13, as adopted by our Supreme Court in *Cuker v. Mikalauskas*, 547 Pa. 600, 692 A.2d 1042 (1997). Essentially, in accordance with our standard of review, we conclude that Judge Burr thoroughly examined the circumstances of this case, his extensive findings of fact are supported by the record, and he did not err or abuse his discretion in determining that the Committee's decision to seek dismissal of the derivative suit was entitled to protection under the business judgment rule. Accordingly, we affirm.

¶ 2 The following is a factual overview of some of the circumstances underlying the LeMenestrels' numerous allegations of wrongdoing primarily on the part of the Wardens, several of which are based on events that occurred back into the early

1990's and even 1980's.[1] The Company is a private corporation owned by the descendants of Clarence A. Warden, Sr., who co-founded the Company's predecessor corporation, Superior Tube Company, with S. Landis Gabel in 1934. Superior Tube Company primarily manufactured and sold metal tubing for industrial use.

¶ 3 Since the early 1990's, when the Company bought-out the Gabel family's interest in the Company for approximately $200 million, the Company has been owned and controlled, individually and beneficially, by the four families that descended from Clarence A. Warden, Sr., including the LeMenestrel family, the Warden family, the Stone family, and the Davis family. The latter two families are not involved in this litigation. In addition to individually held shares, the family members are beneficiaries of the Clarence A. Warden Residuary Trust (the "Trust"), which was created by the will of founder Clarence A. Warden Sr., and which, following the buy-out of the Gabel family ownership interest, holds approximately 57 percent, or 109,960 of the 192,396 outstanding shares of stock in the Company. In all, each family branch owns, individually and beneficially, an approximately 25 percent interest in the Company (following re-acquisition of the Kellys' shares, described below).

¶ 4 Certain members of the Warden family have been most involved in the management and operations of the Company. One of the defendants in this case, Warden III, the grandson of Clarence A. Warden, Sr., commenced his employment with Superior Tube Company in 1957 where he remained an officer until 1998.

Warden III also became a member of the Company's board of directors in 1974 and was chairman of the board from 1995 to 2007. His son, Warden IV, was first employed with one of the Company's subsidiaries, LFC Financial Corporation ("LFC"), prior to commencing employment with the Company in 1995. Warden IV has been a member of the Company's board since 1995 and he became chief executive officer of the Company in 1999. Warden IV also succeeded his father as chairman of the board in 2007.

¶ 5 Indeed, as noted above, in the early 1990's, it was Warden III who negotiated the buyout of the Gabel family's shares in the Company at $1,725 per share, for a total cost to the Company of approximately $200 million, which transaction involved the largest single outlay of cash by the Company up to that point. Additionally, with regard to the Trust, since 1987 when he obtained Orphans' Court approval, Warden III has been one of two trustees (the other is Wachovia Bank, N.A.) with the power to elect directors of the Company. Following the Gabel family buyout, the Trust became the controlling shareholder of the Company. Thus, one of the LeMenestrels' allegations is that the Gabel buyout promoted by Warden III, which increased the ownership interest of the Trust of which Warden III was a trustee, essentially gave Warden III control of the Company, thereby allowing him to employ his sons and pay significant "bonuses" to Warden IV, including lucrative long term incentive payments. *See* LeMenestrels' brief at 6–7.

---

1. For purposes of this litigation, the defendants did not pursue the argument that the statute of limitations applied to preclude the LeMenestrels' claims, but they did not waive the defense. Moreover, independent counsel who assisted the Committee in its investigation of the claims in the LeMenestrels' Demand Letter extended his evaluation into the early 1990's on some matters deemed to potentially provide a history underlying more recent claims. In any event, the application of the statute of limitations to any fiduciary claims is not an issue in this appeal.

¶ 6 Additionally, Paul E. Kelly, Sr. ("Kelly Sr.") was a long-term key executive at the Company, commencing his employment with Superior Tube Company in 1936 as a bookkeeper and eventually becoming its chief executive officer and serving as chairman on its board of directors. Kelly Sr. was, indisputably, largely responsible for the Company's acquisitions and growth into the early 1990's. Indeed, beginning in 1955, the Company acquired a number of corporations in other areas of business, including LFC in 1977 and Oxford First Corporation ("Oxford") in 1988. In 1976, Kelly Sr.'s son, Paul Kelly, Jr. ("Kelly Jr."), also joined the Company, becoming its president in 1983 and serving on its board of directors.

¶ 7 However, as Judge Burr described, following "a protracted period of cooling of business relations with the Wardens commencing in approximately 1991," Kelly Sr. and Kelly Jr. both left the Company in 1995. *See* Order Sustaining the Defendants' Preliminary Objections in the Nature of a Motion to Dismiss Plaintiffs' Shareholders' Derivative Suit and Findings of Fact and Conclusions of Law (hereinafter "Order"), 11/9/07, at 3. As Judge Burr explained, the Kellys thereafter sued Warden III, Warden IV, the Company, and the Trust in 1996, "contending that large and undisclosed company business losses recorded at the end of fiscal year 1994 had caused the value of their four and ½ per cent stock ownership therein to decline." *Id.* at 3–4 (footnoted omitted). Consequently, "[t]he Kellys' shares in [the Company] were bought back by the [C]ompany for $23,087,000.00 in October of 1999, and the Kelly litigation was eventually settled." *Id.* at 4. Louis J. Sinatra, Esq., who represents the LeMenestrels in the instant case, was counsel for the Kellys in their litigation. *Id.*

¶ 8 The events culminating in submission of the LeMenestrels' Demand Letter on the board began with a May 5, 2004 notice of the annual shareholders' meeting, which listed several items of business for consideration, including approval of a Long–Term Incentive Plan ("LTIP"); approval of certain parachute payments to Company executives including Warden IV, Peter G. Gould (Company president), and John M. Morrash (Company senior vice president and chief financial officer) in connection with the expected liquidation of the Company; approval of potential parachute payments to officers of certain subsidiaries expected to be liquidated; and consideration of proposed shareholders' agreements.

¶ 9 However, on May 14, 2004, Attorney Sinatra, acting on behalf of the LeMenestrels, sent a letter to the Company's counsel, Francis Mirabello, Esq., of Morgan Lewis & Bockius LLP ("Morgan Lewis"), raising various issues including concerns about Warden III and Warden IV's management of the Company as directors and Warden IV's performance as CEO, concerns about the potential liquidation of the Company and its subsidiaries, and concerns about the Wardens' involvement in the Trust. The LeMenestrels charged that the proposed actions at the shareholders' meeting appeared to be made for the benefit of the Wardens, to the detriment of the LeMenestrels.

¶ 10 Thereafter, on May 17, 2004, Charles LeMenestrel requested examination of Company documents pursuant to 15 Pa.C.S. § 1508(b). The Company's outside counsel met with Attorney Sinatra to discuss and tailor the list of documents requested and the parties exchanged information throughout the summer of 2004. According to the minutes of a board meeting held on May 20, 2004, "despite the Board's disagreement with the allegations

made in the ... [Demand L]etter, [and] in light of the Board's desire to further consider matters in light of the letter, the Board ... determined that a vote at the Annual Meeting [on items including the parachute payments, LTIP, and proposed shareholders' agreements] is no longer in the best interest of the Company and its shareholders." Minutes, 5/20/04. Essentially, the only item of business left on the agenda for the shareholders' meeting was the election of directors.[2]

¶ 11 At the shareholders' meeting, attended by the LeMenestrels and their attorney, the following seven directors were elected: Warden III, Warden IV, Bachman, Cullen, Langton, Gould, and William M. Goldstein. In further correspondence following the meeting, the LeMenestrels

proposed to redeem their shares at $3,200 per share in exchange for their execution of liability releases of the Wardens and Wachovia Bank, N.A., the other trustee of the Trust. After consideration of this proposal, including the present value per share, the board determined that redemption of the LeMenestrels' shares would not be in the best interests of the Company or other shareholders, and the LeMenestrels were notified of this decision by letter dated September 10, 2004.

¶ 12 At around the same time, Attorney Sinatra, acting on behalf of the LeMenestrels, submitted the Demand Letter, dated August 30, 2004, to the Company's board of directors pursuant to section 7.03 of the ALI Principles.[3] As Judge Burr explained:

---

2. One of the allegations presented by the LeMenestrels in this appeal is that the agenda items were evidence of a scheme by the Wardens to liquidate the Company for their own benefit. However, because these items were withdrawn from the agenda, Judge Burr concluded that consideration of these allegations was moot. Nevertheless, even though the Committee's independent counsel did not believe that withdrawn agenda items (*i.e.*, issues never voted on by the shareholders at their meeting) could constitute a wrong to the corporation, he and the Committee still examined this charge in its final report, in the context of the LeMenestrels' overarching allegation that the Wardens were scheming to take control of the Company and with full consideration of what the duty of loyalty requires. Report at 100–104 (reflecting Committee's investigation of these issues and finding no evidence to substantiate the LeMenestrels' allegations that the Wardens were "scheming" to force-out other shareholders and then sell off the Company for their own benefit). Among the Committee's findings, relevant to this argument, is that the family meetings arranged by Warden IV were to make family members more informed and that the Company's new president, not the Wardens, recommended a strategy of gradual liquidation and diversification of family assets. *See id.* at 102.

3. This provision reads in pertinent part as follows:

§ 7.03 Exhaustion Of Intracorporate Remedies: The Demand Rule

(a) Before commencing a derivative action, a holder [§ 1.22] or a director [§ 1.13] should be required to make a written demand upon the board of directors of the corporation, requesting it to prosecute the action or take suitable corrective measures, unless demand is excused under § 7.03(b). The demand should give notice to the board, with reasonable specificity, of the essential facts relied upon to support each of the claims made therein.

...

ALI Principles § 7.03(a) (1992). We note that the LeMenestrels do not argue that the demand should have been excused.

Further, a comment to section 7.03 indicates that the demand rule serves several purposes, including (1) protecting "the court from unnecessarily hearing a case that is not ripe for decision or that might be mooted by subsequent board action[;]" (2) providing "an opportunity for the board to determine if it will pursue other remedies or take other appropriate action" such as discharging or demoting a defendant employee; (3) permitting "the corporation to take over the suit and control the litigation[;]" and (4) providing "the corporation with an opportunity to reject

The Demand Letter raises claims of losses to certain of [the Company's] subsidiaries, notably LFC and Oxford, in the 1990's, and challenges business decisions of the Wardens relating to the sale or liquidation of certain [of the Company's] subsidiaries and a decline in shareholder equity. The Demand Letter also raises questions relating to the governance of [the Company], actions and decisions pertaining to its shareholders' meetings, and management of the ... Trust.

Order at 4–5. Indeed, in their Demand Letter, the LeMenestrels alleged, *inter alia*, that Warden III and Warden IV breached their fiduciary duties and engaged in "wrongful, self-serving and bad faith acts and omissions ... which have resulted in catastrophic injury to [the Company] and corresponding and substantial loss of value to [the LeMenestrels'] stock [in the Company]." Demand Letter, 8/30/04, at 1. For example, the LeMenestrels contended that the Wardens schemed to buy-out the Gabel family's interest, wrongfully removed the Kellys from the Company, and obtained court approval (without other shareholders being properly informed) in 1987 to place Warden III as a trustee of the Trust (with the power to appoint his own successor)—all in an effort to control the Company for their own benefit. *Id.* at 1–3.[4] The LeMenestrels claimed that, "[o]ver a period of many years, the Wardens have engaged in a pattern of concealment, collusion and misrepresentation, in an effort to hide their efforts to seize control of [the Company] and misrepresent the facts related to their management and [the Company's] catastrophic losses." *Id.* at 7. The LeMenestrels concluded that "there may be other instances of wrongful conduct by the Wardens and under any circumstance, immediate action should be taken by the Board to pursue all necessary and available civil actions against the Wardens to recover from them all [the Company] losses attributable to Wardens' wrongful acts and omissions." *Id.*

¶ 13 In response to the Demand Letter, the board held a special meeting on September 9, 2004. Present at that meeting (in person or by phone) were directors Warden III, Warden IV, Bachman, Goldstein, Gould, Cullen, and Langton. Morrash (VP and CFO), and John A. Sanders (the Company's secretary), also attended. Also present were attorneys Robert J. Lichtenstein and Marc Sonnenfeld of Morgan Lewis, Gary R. Battistoni of Drinker

---

the proposed action or, if it is filed, to seek its early dismissal." *Id.* at cmt. c.

4. The LeMenestrels raised numerous other allegations in the Demand Letter. By way of further example, the LeMenestrels claimed that, due to the Wardens' control and actions, the Company's sales dropped dramatically between 1991 and 1993 (from $700 million to $300 million), that LFC lost approximately $150 million in 1994 due to the Wardens' mismanagement, that the Wardens sold various Company assets (such as property in Hawaii and California, and other subsidiaries) for less than fair market value, and that, beginning in 2001, (and in purported collusion with Wachovia Bank) the Wardens misrepresented the Company's losses to the other family shareholders in an effort to induce them to sell their shares back to the Company for less than fair market value, then sell the assets of the Company to enrich themselves. With regard to this latter allegation, the LeMenestrels purport that the Wardens sought to advance this scheme with the proposals planned for the May 20, 2004 annual shareholders' meeting, described above, which provided incentives for key executives, including Warden IV, to liquidate subsidiaries at low prices. The Demand Letter further alleged that the Wardens proposed to reduce the regular Company dividend, and requested that the other shareholders relinquish important rights pertaining to significant corporate decisions, including the Wardens' effort to control and decide their own compensation.

Biddle & Reath LLP (the Wardens' counsel), and Christopher V. Della Pietra (the Company's general counsel).

¶ 14 At that meeting, Attorney Sonnenfeld discussed the Demand Letter, corresponding ALI Principles, and the duty of care owed by the board to respond to the Demand Letter. He advised, "evaluation of the demand should be made by independent and disinterested directors." Board Minutes, 9/9/04, at 4. At that point, Warden III, Warden IV, Gould, Morrash, and Battistoni were excused from the meeting. "The meeting continued, attended by the independent and disinterested Directors Bachman III, Cullen (by telephone conference), Goldstein, and Langton, and Messrs. Lichtenstein, Sonnenfeld, Della Pietra and Sanders." *Id.* At that point, Attorney Sonnenfeld discussed the proper formation of a special litigation committee to address the issues in the Demand Letter. He advised that such committee retain independent counsel "to develop a response to the demand letter" and he provided a preliminary list of candidates and their qualifications. *Id.* He further "discussed the possible role and functions of the Committee in conjunction with the independent counsel." *Id.* Thereafter, Directors Bachman, Cullen, Goldstein, and Langton voted unanimously to appoint Bachman, Cullen, and Langton to the Committee to investigate the LeMenestrels' claims and determine whether prosecution of these claims would be in the best interests of the Company. Additionally, the remaining board members resolved that all officers, agents and employees of the Company assist the Committee and "provide it with all information and documents that it shall request with respect to the subject matter of the Claims [in the Demand Letter]. . . ." *Id.* at 5.

¶ 15 On the same date, September 9, 2004, the Committee held its first meeting, attended by all Committee members (*i.e.,* Bachman, Cullen, and Langton), and by Attorney Sonnenfeld and Attorney Lichtenstein of Morgan Lewis, and Attorney Della Pietra, the Company's general counsel. Attorney Sonnenfeld provided the Committee with a list of six potential attorneys to assist in the Committee's investigation, discussed potential conflicts with each attorney, and reminded the Committee that it was always free to seek counsel other than the six that were suggested. After eliminating counsel having potential conflicts, the Committee decided to interview four candidates, including John G. Harkins, Jr., Esq., of Harkins Cunningham LLP. After interviewing potential candidates, the Committee thereafter selected Attorney Harkins as independent counsel.

¶ 16 The Committee, assisted by Attorney Harkins, embarked on an extensive investigation into the claims made in the Demand Letter, culminating in a draft report dated February 11, 2005, and in March of 2005 the Committee unanimously adopted the final report (the "Report"), concluding that there was no basis or evidence upon which to support a suit by the Company against the Wardens and that, therefore, pursuing those claims through litigation would not be in the best interests of the Company.

¶ 17 The instant litigation commenced with the LeMenestrels' filing a complaint, "derivatively, on behalf of [the Company]" on May 10, 2005, and against Warden III, Warden IV, the members of the Committee, *i.e.,* Bachman, Cullen, and Langton, and the Company. The complaint alleged, *inter alia,* that the Committee members breached their fiduciary duties with respect to their investigation of the claims in the Demand Letter and that the Committee, although having an "opportunity to redress Wardens' wrongful conduct[,] . . .

instead, whitewashed that misconduct and produced a sham investigation and report." Complaint at ¶ 1.

¶ 18 On July 8, 2005, the defendants filed a "Defendants' Preliminary Objection in the Form of a Motion to Dismiss Pursuant to Section 7.08 of The American Law Institute Principles of Corporate Governance." On September 12, 2005, Judge Burr issued an order overruling the preliminary objections and motion to dismiss without prejudice, and granted the LeMenestrels leave to

> obtain discovery ... limited to the issues as to whether [the Committee] appointed by the Board of Directors of [the Company] was properly established in compliance with the procedures required by the governing ALI Principles; whether the individual members of [the Committee] were disinterested, independent and impartial; and whether the investigation conducted by [the Committee] was adequately informed so as to lead to a rationally based conclusion that it was not in the best interests of [the Company] to file suit against [the Wardens].

Order, 9/12/05. Thereafter, Judge Burr convened six days of hearings on the matter in September of 2006. Following the hearings, each party filed memoranda and proposed findings of fact, and oral argument was conducted on July 27, 2007. On November 9, 2007, Judge Burr issued an order, along with extensive findings of fact, sustaining the defendants' preliminary objections and granting their motion to dismiss the derivative suit with prejudice. The LeMenestrels filed a timely notice of appeal from this order on December 6, 2007.

¶ 19 Appellants present the following "Statement of Questions Involved" in their brief:

1. Whether the Trial Court erred in determining that the [Committee] conducted an informed and adequate investigation of plaintiffs' claims where the [Committee] completely abdicated its investigative role to outside counsel and conducted no meaningful or independent review of the findings, conclusions and recommendations of its outside counsel?

2. Whether the Trial Court erred in determining that the members of the [Committee] were independent and disinterested within the meaning of the ALI Principles of Corporate Governance?

3. Whether the Trial Court erred in determining that the [Committee] conducted an informed and adequate investigation within the meaning of the ALI Principles of Corporate Governance where critical information was kept from the [Committee] by outside counsel and where the [Committee] members admitted that they would have considered the undisclosed, material information in making their recommendation?

4. Whether the Trial Court erred in reaching substantive findings of fact and conclusions of law without full blown discovery and a due process trial on the merits?

5. Whether the Trial Court's substantive findings and conclusions were against the clear weight of the evidence and an abuse of discretion?

6. Whether the Trial Court erred in not treating plaintiffs' action as a direct action and dismissing the Preliminary Objections on that basis?

Appellants' brief at 3 (trial court "answers" omitted).[5] Initially, we recognize

---

5. Unfortunately, the organization of the ar-

gument section of Plaintiffs' brief does not

that we will not reverse a trial court's decision to sustain preliminary objections unless there has been an error of law or abuse of discretion. *Cornerstone Land Dev. Co. of Pittsburgh LLC v. Wadwell Group*, 959 A.2d 1264, 1266 (Pa.Super.2008).

¶ 20 In their first three issues, the LeMenestrels challenge the formation and composition of the Committee and the conduct and adequacy of its investigation of the allegations in the Demand Letter. We begin our analysis of these issues with reference to the *Cuker* decision, which provides the most guidance. In *Cuker*, our Supreme Court concluded that the business judgment rule [6] serves to permit the board of directors of a corporation to terminate a derivative suit brought by minority shareholders. *Cuker*, 692 A.2d at 1045; *see also* ALI Principles § 7.05(a)(3) (indicating that the board may "[m]ove to dismiss [a shareholders' derivative] action as contrary to the best interests of the corporation ... [.]"). "Decisions regarding litigation by or on behalf of a corporation, including shareholder derivative actions, are business decisions as much as any other financial decision. As such, they are within the province of the board of directors." *Cuker*, 692 A.2d at 1048. The *Cuker* Court cautioned that, "if a court

---

[6]. The *Cuker* Court examined various definitions of the business judgment rule, including the following:

> The business judgment rule insulates an officer or director of a corporation from liability for a business decision made in good faith if he is not interested in the subject of the business judgment to the extent he reasonably believes to be appropriate under the circumstances, and rationally believes that the business judgment is in the best interests of the corporation.

*Cuker*, 692 A.2d at 1045 (citing ALI Principles § 4.01(c)). Additionally, the Court noted:

correspond with these enumerated questions. *See* Pa.R.A.P. 2119(a) ("The argument shall be divided into as many parts as there are questions to be argued...."). Although this deficiency does not facilitate our appellate review, it does not impair our review to the extent that we would decline to address the issues on this basis. *Donahue v. Federal Express Corp.*, 753 A.2d 238, 241 n. 3 (Pa.Super.2000) (finding appellate review not hampered by discrepancy between argument portion of brief and statement of questions involved); *Levin v. Board of Supervisors of Benner Township, Centre County*, 669 A.2d 1063, 1068 n. 3 (Pa.Cmwlth.1995) ("The Pennsylvania Rules of Appellate Procedure were promulgated to govern practice and procedure before the appellate courts and noncompliance with the rules only makes this court's review of appeals more difficult.").

> It is a presumption that in making a business decision the directors of a corporation acted on an informed basis in good faith and in the honest belief that the action taken was in the best interests of the company. Absent an abuse of discretion, that judgment will be respected by the courts. The burden is on the party challenging the decision to establish facts rebutting that presumption.

*Id.* at 1045–46 (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del.1984) (citations omitted)). The Court enumerated the various public policy interests advanced by the business judgment rule including "encouraging competent individuals to become directors by insulating them from liability for errors in judgment[;]" "provid[ing] directors broad discretion in setting policies without judicial or shareholder second-guessing" given that business decisions frequently entail some degree of risk; and "prevent[ing] courts from becoming enmeshed in complex corporate decision making, a task they are ill-equipped to perform." *Id.* at 1046 (citations omitted). The Court summarized:

> [T]he business judgment rule reflects a policy of judicial noninterference with business decisions of corporate managers, presuming that they pursue the best interests of their corporations, insulating such managers from second-guessing or liability for their business decisions in the absence of fraud or self-dealing or other misconduct or malfeasance.

*Id.*

makes a preliminary determination that a business decision was made under proper circumstances, however that concept is currently defined, then the business judgment rule prohibits the court from going further and examining the merits of the underlying business decision." *Id.* at 1047. In other words: "Without considering the merits of the action, a court should determine the validity of the board's decision to terminate the litigation; if that decision was made in accordance with the appropriate standards, then the court should dismiss the derivative action prior to litigation on the merits." *Id.* at 1048. The Court further explained:

The business judgment rule should insulate officers and directors from judicial intervention in the absence of fraud or self-dealing, if challenged decisions were within the scope of the directors' authority, if they exercised reasonable diligence, and if they honestly and rationally believed their decisions were in the best interests of the company. **It is obvious that a court must examine the circumstances surrounding the decisions in order to determine if the conditions warrant application of the business judgment rule.** If they do, the court will never proceed to an examination of the merits of the challenged decisions, for that is precisely what the business judgment rule prohibits. In order to make the business judgment rule meaningful, the preliminary examination should be limited and precise so as to minimize judicial involvement when application of the business judgment rule is warranted.

To achieve these goals, a court might stay the derivative action while it determines the propriety of the board's decision. The court might order limited discovery or an evidentiary hearing to resolve issues respecting the board's decision. **Factors bearing on the board's decision will include whether the board or its special litigation committee was disinterested, whether it was assisted by counsel, whether it prepared a written report, whether it was independent, whether it conducted an adequate investigation, and whether it rationally believed its decision was in the best interests of the corporation (i.e., acted in good faith).** If all of these criteria are satisfied, the business judgment rule applies and the court should dismiss the action.

*Id.* at 1048 (emphasis added, footnote omitted). The *Cuker* Court noted that "[t]hese considerations and procedures are all encompassed in Part VII, chapter 1 of the ALI Principles (relating to the derivative action), which provides a comprehensive mechanism to address shareholder derivative actions." *Id.* at 1048–49.

¶ 21 These holdings in *Cuker* appear to be a distillation of, specifically, the ALI Principles, section 7.07(a)(2), which directs the court to dismiss a derivative action against a director, senior executive, or other person in control upon the motion by the board or a properly designated committee where the further requirements of sections 7.08 are met. Section 7.08, in turn, upon which the defendants in this case relied in making their preliminary objection, indicates that the court should dismiss the derivative action upon motion by the board or committee requesting such dismissal as in the best interests of the corporation if the procedures specified in § 7.09 (Procedures for Requesting Dismissal of a Derivative Action) "were substantially complied with ... or any material departures therefrom were justified under the circumstances" and "[t]he determinations of the board or committee satisfy the applicable standard of review set forth in § 7.10(a) (Standard of Judicial Review with Regard to a Board

or Committee Motion Requesting Dismissal of a Derivative Action Under § 7.08)." ALI Principles § 7.08.

¶ 22 Section 7.09, which we consider in conjunction with the factors enumerated in *Cuker*, delineates the procedural standards applicable to the review and evaluation of a derivative action by a board or committee under section 7.08, including the following: (1) the board/committee is composed of two or more persons who are not "interested in the action, and should as a group be capable of objective judgment in the circumstances;" (2) the board/committee "should be assisted by counsel of its choice and such other agents as it reasonably considers necessary;" (3) the determinations of the board/committee "should be based upon a review and evaluation that was sufficiently informed to satisfy the standards applicable under § 7.10(a);" and (4) the board/committee should prepare a written report if it determines to request dismissal of the derivative suit and the report must set forth the determinations of the board/committee "sufficient to enable the court to conduct the review required under § 7.10 . . . ." *Id.* at § 7.09(a).

¶ 23 Section 7.10 provides the standard of review for a court faced with the decision of whether to dismiss a derivative claim pursuant to section 7.08. Essentially, it instructs that if the "gravamen of the claim is that the defendant violated" the fiduciary duty of care

> other than by committing a knowing and culpable violation of law that is alleged with particularity or if the underlying transaction or conduct would be reviewed under the business judgment rule under § 5.03, § 5.04, § 5.05, § 5.06, § 5.08, or § 6.02, the court should dismiss the claim unless it finds that the board's or committee's determinations fail to satisfy the requirements of the

business judgment rule as specified in § 4.01(c).

ALI Principles § 7.10(a)(1). Where the claim implicates "cases governed by Part V" of the ALI Principles, pertaining to the duty of fair dealing, or other situations in which the business judgment rule would not be applicable, the standard is that the court should

> dismiss the action if the court finds, in light of the applicable standards under Part IV, V, or VI that the board or committee was adequately informed under the circumstances and reasonably determined that dismissal was in the best interests of the corporation, based on grounds that the court deems to warrant reliance.

*Id.* § 7.10(a)(2). With these standards in mind, we now examine the LeMenestrels' contentions that Judge Burr erred or abused his discretion by determining that the Committee properly delegated investigatory duties to Attorney Harkins, was properly informed, conducted an investigation that was adequate in scope, and was properly composed of disinterested and independent directors such that the business judgment rule should apply to dismiss the derivative suit without delving into the merits of the underlying allegations of wrongdoing. We conclude initially that Judge Burr did not err or abuse his discretion.

■ ¶ 24 In their first and third issues, the LeMenestrels argue that the Committee improperly abdicated its investigative role in deference to outside counsel, Attorney Harkins, and, essentially, adopted his report with little input or knowledge about critical issues underlying the allegations of wrongdoing in the Demand Letter (*i.e.*, the Committee was not adequately informed). Therefore, the LeMenestrels claim that the Committee cannot rely on the business judgment rule, which applies to protect the

business decisions of corporate directors and officers, as a basis upon which to seek dismissal of the derivative suit. However, the record supports Judge Burr's conclusions that the Committee properly relied on Attorney Harkins and that they were adequately informed.

¶ 25 As mentioned above, section 7.09(a)(2) of the ALI Principles states that "[t]he board or committee should be assisted by counsel of its choice and such other agents as it reasonably considers necessary" in conducting its review and investigation of claims in a demand made on the board. The *Cuker* Court did not address specifically the level of involvement of a special litigation committee vis-à-vis that of the independent attorney it retains to assist in its investigation. Indeed, the LeMenestrels cite to cases in other jurisdictions, such as *Peller v. The Southern Co.*, 707 F.Supp. 525, 529 (N.D.Ga.1988), aff'd, *Peller v. Southern Co.*, 911 F.2d 1532 (11th Cir.1990). The LeMenestrels argue that the federal district court in *Peller* rejected an independent litigation committee's determination to seek dismissal of a derivative suit where the committee relied on outside counsel almost "exclusively" in the substantive aspects of the investigation, including interviews.

¶ 26 Indeed, the district court was "troubled" by the level of reliance; however, it admitted that such reliance was "an accepted practice." *Peller*, 707 F.Supp. at 529. Moreover, the district court's ultimate determination that the independent litigation committee in *Peller* did not act in good faith was because outside counsel conducted interviews and prepared summaries that contained "privileged information" thereby "insulat[ing] its investigation from scrutiny by plaintiff." *Peller*, 707 F.Supp. at 529. In the instant case, the LeMenestrels do not claim that Attorney Harkins and/or the Committee insulated its findings by asserting any type of evidentiary privilege, so *Peller* is unavailing.

¶ 27 Similarly, the LeMenestrel's reliance on *Stepak v. Addison*, 20 F.3d 398 (11th Cir.1994) is misplaced because, in that case, the court determined that there was reasonable doubt that the committee exercised its business judgment validly in refusing a shareholder demand where the counsel chosen to assist in the investigation not only dominated the investigation, but had "represented the alleged wrongdoers in criminal proceedings involving the very subject matter of that demand" and, therefore, counsel was clearly conflicted. *Stepak*, 20 F.3d at 401–403. No such conflict exists with Attorney Harkins in the instant case; therefore, *Stepak* does not support the LeMenestrels' argument of improper abdication of the investigatory or decision-making role of the committee.

¶ 28 In examining the issue of Attorney Harkins' involvement and the scope of his inquiry, Judge Burr relied on *Auerbach v. Bennett*, 47 N.Y.2d 619, 419 N.Y.S.2d 920, 393 N.E.2d 994, 1003 (1979) for the proposition that:

> Proof, however, that the investigation has been so restricted in scope, so shallow in execution, or otherwise so Pro forma or halfhearted as to constitute a pretext or sham, consistent with the principles underlying the application of the business judgment doctrine, would raise questions of good faith or conceivably fraud which would never be shielded by that doctrine.

Additionally, Judge Burr recognized cases standing for the proposition that the use of capable counsel is desirable and is another indicator of good faith on the part of a special litigation committee. *See* Order at 26 (citing *Grafman v. Century Broadcasting Corp.*, 762 F.Supp. 215, 220 (N.D.Ill.1991), *Rosengarten v. International Tel. & Tel. Corp.*, 466 F.Supp. 817, 825

(S.D.N.Y.1979)). *Cf. In re Par Pharmaceutical, Inc. Derivative Litigation*, 750 F.Supp. 641, 644 (S.D.N.Y.1990) (frowning on special litigation committee's failure to hire independent legal counsel). Judge Burr further observed that some courts have accepted the recommendations of a special litigation committee even where independent counsel, rather than the committee members, has conducted the witness interviews, as in the instant case. *See, e.g., Rosengarten v. Buckley*, 613 F.Supp. 1493, 1502–1503 (D.C.Md.1985) (finding interview procedures adequate where counsel conducted comprehensive interviews and committee retained right to conduct re-interviews). *See also Johnson v. Hui*, 811 F.Supp. 479, 489 (N.D.Cal. 1991) (indicating that issue was "not whether the [special litigation committee's] reliance on counsel was substantial, but whether the [committee's] reliance on counsel amounts to an abdication ... of its investigative role, or renders the [committee's] conclusions unreasonable or unreliable" and concluding that substantial reliance on counsel "to gather documents and interview witnesses does not appear to have affected the independence of the [the committee], the reliability of the [committee's] evidence gathering, or the reasonability of [the committee's] analysis").

¶ 29 Indeed, Judge Burr's conclusions that the Committee acted independently and in good faith, and that Attorney Harkins, an eminently qualified practitioner,[7] conducted an extensive investigation into the claims made in the Demand Letter and did not "so dominate" the Committee so as to "control its conclusions" or taint its objectivity, such that application of the business judgment rule to the Committee's decision to seek dismissal of the derivative suit was proper, are supported by the record. For example, as evidence of good

---

7. The LeMenestrels do not challenge Attorney Harkins' qualifications. As stated by Judge Burr, Attorney Harkins has fifty years' experience in complex corporate litigation matters since he "graduated *summa cum laude* from Penn's Law School" in 1958. Order at 9. Attorney Harkins became chairman of the firm of Pepper, Hamilton & Sheetz prior to forming his own firm of Harkins Cunningham, LLP. *Id.* He is a fellow of the American College of Trial Lawyers and was an active participant in the debates surrounding the creation of the ALI Principles upon which we rely in the instant case. *See id.* Attorney Harkins has been involved in corporate investigations and has advised other special litigation committees. *Id.* Neither Attorney Harkins nor his firm had any prior relationship with the Company, its subsidiaries, or its directors, including Warden III and Warden IV. *Id.* at 10.

The trial court specifically rejected the LeMenestrels' contention (also argued in their brief to this Court) that Attorney Harkins was conflicted because he has provided legal representation in the past to the firm of Morgan Lewis, the Company's counsel. *Id.* We agree with Judge Burr's conclusion that these circumstances do not establish a conflict that would taint Attorney Harkins' objectivity in his investigation and reports to the Committee. Additionally, the LeMenestrels fail to provide any further explanation beyond their mere assertion that some unspecified prior representation of the Company's law firm necessarily creates a conflict herein. Contrastingly, in *Brinckerhoff v. JAC Holding Corp.*, 263 A.D.2d 352, 692 N.Y.S.2d 381, 381 (1999) the court concluded that "[t]he motion court correctly found that plaintiffs had met their burden of raising a reasonable doubt as to the adequacy of the special committee's investigation because the committee was not advised by independent counsel, but rather by an attorney who had represented [the company] in connection with the challenged transaction...." Attorney Harkins had no such conflict. (Additionally, the *Brinckerhoff* court criticized that "the report of the special committee was a mere two pages in length with respect to the subject transaction, and failed to document the special committee's procedures, reasoning and conclusions, thus effectively insulating its investigation from scrutiny by the courts"—the instant case differs in this regard also, as the Committee's final report was a thorough, 106–page–long analysis of the LeMenestrels' claims).

faith, the Committee (and Attorney Harkins) pledged to pursue claims in the Demand Letter if the results of the investigation had so warranted. Order at 8 (citing, for example, N.T. Hearing, 9/7/06, at 304–305, where Langton indicated that neither Warden III nor Warden IV attempted to influence his judgment and that he would have been prepared to proceed with litigating the derivative suit had the findings so warranted). The Committee made the prudent decision to hire independent counsel to assist in the investigation, and carefully considered and interviewed several candidates, before choosing Attorney Harkins. *See, e.g.,* Committee Minutes, 9/9/04, at 6.

¶ 30 Further, as evidence of Committee involvement, Attorney Harkins told the Committee that he would develop a preliminary plan and would meet with Committee members to "insure that we receive adequate input and direction from the Committee" and, in fact, Attorney Harkins did correspond with the Committee regularly and met with the Committee on several occasions to discuss matters pertaining to the investigation, as memorialized in the Committee's minutes. *See, e.g.,* Attorney Harkins' letter, 9/29/04. Attorney Harkins and the Committee discussed matters including the proper scope of the investigation, the general procedures to follow during the investigation, the kinds of claims raised in the Demand Letter, and which claims would be subject to a derivative action based upon an alleged breach of fiduciary duties. N.T. Hearing, 9/5/06, at 59–64, 86. As Judge Burr noted, Attorney Harkins "reviewed deposition transcripts from the Kelly litigation and kept the [Committee] apprised of his activities and progress by means of regularly submitted written correspondence." Order at 12. *See also* Letter from Attorney Harkins to Committee, 10/1/04. Accordingly, the record supports Judge Burr's conclusion that the Committee did not improperly abdicate its role in complete deference to Attorney Harkins, as the LeMenestrels contend.

¶ 31 Additionally, we conclude that the Committee was properly informed when reaching its decision, and the scope of the investigation was adequate to cover allegations raised in the Demand Letter and additional concerns voiced by Attorney Sinatra to Attorney Harkins during the investigation. Attorney Harkins examined thousands of documents including deposition transcripts in the Kelly litigation and other documentation provided by Attorney Sinatra during the course of the Committee's investigation. Indeed, the LeMenestrels concede in their brief that Attorney Harkins "had all the relevant documents[.]" LeMenestrels' brief at 33.

¶ 32 Attorney Harkins also interviewed numerous witnesses and prepared summaries of those interviews that he assured the court were freely available for review (and therefore there was no issue of evidentiary privilege). *See* Order at 12 (citing N.T., 9/5/06, at 144). These interviews were relevant to the LeMenestrels' claims. Judge Burr found specifically:

> Throughout December of 2004 and January of 2005, Mr. Harkins interviewed: Richard Stewart, a 28 year employee of [the Company] and its subsidiaries, who had a particular understanding of matters involving LFC; John Sanders, [the Company's] Vice–President of Finance, who had particular knowledge regarding the selling of [the Company's] subsidiaries; Christopher Della Pietra, [the Company's] General Counsel, who possessed knowledge of [the Company's] liabilities in light of certain of its divestitures; Gary Potters, who was particularly involved in assessing asbestos liability claims for the [C]ompany; and Richard Warden, another descendant of Clarence

Warden, Sr., who had personal knowledge of the [C]ompany's real estate transactions, including the California and Hawaiian land sales mentioned in the Demand Letter.... Also during this period, Mr. Harkins again reviewed the depositions taken in the Kelly litigation; interviewed Warden III, and reinterviewed Warden IV, as well as Messrs. Gould and Morrash regarding the sale of [the Company's] subsidiaries, Drever Company, Pacific Tube Company ..., and Swepco Tube Corporation.... Moreover, in December of 2004, Mr. Harkins interviewed and conferred with Mr. Sinatra to ensure that the investigation considered issues viewed by the Plaintiffs as significant, whether or not they had been set forth in the Demand Letter.... There is no dispute that Mr. Harkins specifically informed Mr. Sinatra that neither he, nor [the Company's] defense counsel in the Kelly litigation, possessed copies of any of the exhibits amassed in that case.... Neither was it refuted that Mr. Sinatra made no recommendations of the names of any individuals to be interviewed by Mr. Harkins for purposes of the [Committee's] investigation.....

Order at 13–14.[8] Judge Burr also noted that Attorney Harkins tailored the scope of the investigation (so as to include further inquiry with regard to, for example, LFC and Oxford) after talking with Attorney Sinatra and further delineating his concerns. *Id.* at 14–15. Moreover, Judge Burr reasonably concluded that Attorney Harkins properly decided to rely on some deposition testimony from the Kelly litigation, which occurred ten years' earlier when those witnesses' memories were fresher. *Id.* at 15. After nearly five months of investigation, with draft and revised reports submitted to the Committee, the extensive 106–page final report prepared by Attorney Harkins for the Committee explained, in a thorough, even-handed manner, the background and events leading up to the claims in the Demand Letter, the response of the board and formation of the Committee (including an independence analysis), the scope of the investigation, and findings and recommendations in light of the fiduciary duties owed by the defendant directors and officers of the Company.

¶ 33 Although the LeMenestrels point to various places in the record where a Committee member may have admitted lack of knowledge with regard to one specified point or another,[9] we conclude that Judge

---

8. Another one of the LeMenestrels' contentions in this appeal is that the Committee did not conduct an adequate investigation because they did not interview 13 individuals, listed in the LeMenestrels' brief. Without further elaboration, the LeMenestrels assert that these persons "played a significant role in the events described in the Derivative Complaint[.]" LeMenestrels' brief at 45–46. However, the LeMenestrels fail to indicate what information these witnesses would have provided that was either significant to the Committee's investigation or unavailable from other sources (such as the depositions in the Kelly litigation). Accordingly, the LeMenestrels have failed to persuade us that this contention has merit.

9. For example, both in their main brief and their reply brief, the LeMenestrels cite to Bachman's hearing testimony that "there was no input from the [C]ommittee. The [C]ommittee relied on Mr. Harkins to determine what was relevant." N.T., 9/8/06, at 49. However, in each reference, the LeMenestrels fail to note the question preceding this response, which inquired specifically about whether, during progress meetings with Attorney Harkins, there were discussions pertaining to a former expression of interest from the Bank of Boston in purchasing the Oxford subsidiary. Thus, the seemingly sweeping representation that "there was no input from the [C]ommittee" pertained only to this specific matter, not the entire investigation.

Burr did not abuse his discretion by concluding that the totality of the circumstances (including the evidence of record detailed above) revealed that the Committee was adequately informed with regard to the derivative claims being made by the LeMenestrels such that the Committee's decision was entitled to protection under the business judgment rule.

¶ 34 However, we will briefly address some of the other arguments presented by the LeMenestrels in support of their position that the Committee was uninformed. For example, they also contend that the investigation was inadequate because Attorney Harkins did not review critical documents such as the exhibits to the depositions in the Kelly litigation. *See* LeMenestrels' brief at 34. Nevertheless, the LeMenestrels fail to indicate what information in the exhibits would have been relevant to the review and, further, the LeMenestrels admit that the exhibits were thoroughly discussed in the depositions themselves, which Attorney Harkins had in his possession. *See, e.g, id.* at 33 ("[A]ll of the key exhibits were discussed in detail in the deposition transcripts, which Harkins possessed and claimed to have reviewed, and many were cited verbatim during the questioning of the witnesses.").

¶ 35 Additionally, the LeMenestrels contend that the investigation was inadequate because Attorney Harkins did not properly consider the "Ouzts Report" that had been commissioned by the Kellys in 1994 by a well-respected petroleum engineer and which recommended that the Company sell its natural gas properties by the end of 1994. *Id.* The LeMenestrels contend that the Wardens improperly dismissed the findings in the Ouzts Report, thereby delaying sale of these properties and resulting in the loss of millions of dollars at LFC. However, we conclude that Judge Burr did not err or abuse his discretion by accepting as credible Attorney Harkins' position that his "decision not to interview Johnnie [sic] Ouzts rested on his own conclusion that the subject matter of the Ouzts Report was fully covered in the Kelly litigation depositions and in the [Committee's] Report itself." *Id.* Indeed, the LeMenestrels fail to indicate what new information, beyond that in the Ouzts Report itself, an interview of its author, Johnie Ouzts, would provide. Thus, in sum, we conclude that the record, taken as a whole, reasonably supports the determinations of Judge Burr that the Committee was adequately informed with regard to the LeMenestrels' claims and that the Committee did not improperly rely on Attorney Harkins.

▮▮▮ ¶ 36 In their second issue, the LeMenestrels posit that the Committee was neither independent nor disinterested as per the ALI Principles. "The business judgment rule does not foreclose inquiry by the courts into the disinterested independence of those members of the board chosen by it to make the corporate decision on its behalf—here the members of the special litigation committee." *Auerbach,* 419 N.Y.S.2d 920, 393 N.E.2d at 1001. Section 1.23 of the ALI Principles define "interested" in pertinent part as follows:

(a) A director [§ 1.13] or officer [§ 1.27] is "interested" in a transaction or conduct if either:

(1) The director or officer, or an associate [§ 1.03] of the director or officer, is a party to the transaction or conduct;

(2) The director or officer has a business, financial, or familial relationship with a party to the transaction or conduct, and that relationship would reasonably be expected to affect the director's or officer's judgment with

respect to the transaction or conduct in a manner adverse to the corporation;

(3) The director or officer, an associate of the director or officer, or a person with whom the director or officer has a business, financial, or familial relationship, has a material pecuniary interest in the transaction or conduct (other than usual and customary directors' fees and benefits) and that interest and (if present) that relationship would reasonably be expected to affect the director's or officer's judgment in a manner adverse to the corporation; or

(4) The director or officer is subject to a controlling influence by a party to the transaction or conduct or a person who has a material pecuniary interest in the transaction or conduct, and that controlling influence could reasonably be expected to affect the director's or officer's judgment with respect to the transaction or conduct in a manner adverse to the corporation.

. . .

(c) A director is interested in an action within the meaning of Part VII, Chapter 1 (The Derivative Action), but not elsewhere in these Principles, if:

(1) The director is interested, within the meaning of Subsection (a), in the transaction or conduct that is the subject of the action, or

(2) The director is a defendant in the action, except that the fact a director is named as a defendant does not make the director interested under this section if the complaint against the director:

(A) is based only on the fact that the director approved of or ac-

quiesced in the transaction or conduct that is the subject of the action, and

(B) does not otherwise allege with particularity facts that, if true, raise a significant prospect that the director would be adjudged liable to the corporation or its shareholders.

ALI Principles § 1.23. Initially, we agree with Judge Burr's conclusions, supported by the record, that the Committee was composed of members who were not interested as that term is defined above.

¶ 37 However, the LeMenestrels contend specifically that (1) each Committee member has been a director "for a substantial period of that time embraced by the claims set forth in the Derivative Complaint[,]" LeMenestrels' brief at 40; [10] and (2) two Committee members, Bachman and Langton, served on the Company's compensation committee, which approved bonuses and compensation paid to Warden IV, *id.* at 41. However, mere service on the board does not make the special litigation committee member "interested." *See Peller,* 707 F.Supp. at 527–29 (discussing structural bias).

¶ 38 The LeMenestrels also argue that Cullen was not disinterested because he "was intimately involved in the decisions which led to the liquidation of [Oxford]." LeMenestrels' brief at 41. However, to the contrary, Judge Burr found as follows:

13. [Committee] member, Louis T. Cullen, served in the United States Army, after which he was employed by G.E. Capital in numerous areas of responsibility and managed major segments of G.E. Capital's business. (Hearing Exhibit D–4). From 1984 to 1992, Mr. Cullen held various positions with Meritor/PSFS, a $20 billion financial institu-

---

**10.** As the LeMenestrels note, Cullen has been a director since 1996, and Bachman and Langton became directors in 2000. LeMenestrels' brief at 40.

tion, and completed his tenure there as President/Chief Operating Officer. (9/6/06 N.T. 174–175). In 1992, the Federal Reserve Bank brought in Mr. Cullen to be Chief Executive Officer of the $600 million Glendale Bank, which was eventually sold to Mellon Bank. (9/6/06 N.T. 175).

14. Following his retirement and shortly before October 11, 1994, Mr. Cullen was approached by Roger Hillas, [a Company] director, who asked Cullen to consider employment with the [Company] subsidiary, Oxford, and Cullen accepted the offer. (9/5/06 N.T. 77, 175–176). [The Company] had acquired Oxford in 1988 at Kelly, Sr.'s direction, and supervision thereof was subsequently undertaken by Kelly, Jr., who oversaw its operations until 1994. (Hearing Exhibit, [Committee] Report, D27 and P–11, pp. 45–46). Oxford was in the business of purchasing portfolios of receivables such as those generated from mobile home sales, sales of home sites, sales of timeshares, as well as income from second home mortgages equity loans. (*Id.* at 46). Oxford remained profitable for approximately five years following its acquisition, but soon after Oxford's founder and CEO died in 1993, the company began experiencing portfolio problems, and by 1994, was experiencing increasing liquidity problems. (*Id.*).

15. Mr. Cullen attended an Oxford creditors' meeting with [the Company] and Oxford personnel on October 11, 1994, where he attempted to "buy time" in order to persuade its lenders to re-open Oxford's lines of credit. (9/5/06 N.T. 77; 9/7/06 N.T. 51–52). Almost immediately thereafter, however, threats by other lenders to call in their loans caused Oxford to file for bankruptcy. (9/5/06 N.T. 77; 9/7/06 N.T. 51–52). Mr. Cullen's employment with Oxford for the ensuing year consisted in leading the reorganization and liquidation effort that followed. (9/5/06 N.T. 78–77[sic]; 9/7/06 N.T. 175–176). While Mr. Cullen was involved in the decision to convert Oxford's bankruptcy to liquidation, this determination was made by [the Company's] Board of Directors and management personnel, and not solely by Mr. Cullen. (9/7/06 N.T. 175–176). Because he did nothing to create the problems at Oxford of which Plaintiffs complain, and because he had no involvement in the actions alleged pertaining to Oxford in the Demand Letter, the Court finds that Mr. Cullen possessed the requisite degree of independence for purposes of serving as a member on the [Committee].

Order at 7–8. These findings of fact, supported by the record, reveal that the court did not abuse its discretion by concluding that Cullen was disinterested and could therefore properly serve on the special litigation committee in this case.

■ ¶ 39 The LeMenestrels further argue that Goldstein (who was not elected to the Committee, but participated in the board vote that formed the Committee) was not disinterested because, in 1994, he filled the "Board vacancy created when Warden III successfully maneuvered an increase in Board membership" and because he co-authored a November 1994 legal opinion approving interest free loans from LFC to its subsidiary at the time, LFC Energy, "thereby lining the pockets of the LFC Energy minority shareholders at the expense of the parent[.]" LeMenestrels' brief at 42. The LeMenestrels further contend that Goldstein was the Company's lawyer and the Wardens' lawyer in the Kelly litigation, he was a key witness in the Kelly litigation, and "is a principal witness in the present lawsuit." *Id.* at 42.

¶ 40 As Judge Burr noted on this point:

The Plaintiffs have challenged Mr. Goldstein's participation in the composition of [the Committee] because his firm has represented [the Company] and the Wardens. Nevertheless, Mr. Goldstein was the only other member of the board besides Messrs. Bachman and Langton who had not worked as an employee of the corporation during the periods to be investigated, and was, therefor[e], clearly less interested than the other board members who were not selected to serve on the [Committee]. In any event, corporate boards would clearly be hamstrung in exercising their discretion to appoint special litigation committees if those permitted to select the membership were limited only to those not interested in the business judgment under investigation. Nevertheless, this contention is deemed to be without merit because *Cuker v. Mikalauskas,* 692 A.2d at 1044, imposes no such requirement. *See also Powell v. First Rep. Bank,* 274 F.Supp.2d 660, 670 (E.D.Pa.2003).

Order at 5 n. 3. We agree with Judge Burr's consideration and reasoning on this point and, in further support of his decision, note that a comment to the ALI Principles provides that: "[W]hen disinterested directors are not available to appoint the committee, then necessity justifies the involvement of the interested director.... If quorum requirements necessitate the vote of interested directors, they should limit their participation to voting to ratify the choice of the other directors." ALI Principles § 7.09 cmt. f. Likewise, the court in *Powell* noted:

Many courts have allowed interested directors to appoint an independent committee to review a derivative action. *See e.g., Lewis v. Anderson,* 615 F.2d 778, 783 (9th Cir.1980) ("[T]he fact that the independent committee members were appointed by interested directors is an 'inescapable' aspect of 'the corporation's predicament.'"); *Stein v. Bailey,* 531 F.Supp. 684, 693 (S.D.N.Y.1982) ("If the Court were to adopt plaintiff's reasoning, which suggests that interested directors be excluded from a meeting held to appoint an independent committee, the Court can envision a situation whereby too few directors are present to constitute a quorum. Since this would undermine the efficacy of the rule, plaintiff's first point is rejected.")....

*Powell,* 274 F.Supp.2d at 670. Accordingly, not only was there record support that Goldstein was sufficiently disinterested to elect Committee members, as he had not been employed by the Company during the time period of alleged wrongdoing, his presence was necessary for election of the Committee members, and, in consideration of the above points, we can discern no reversible error.

¶ 41 The LeMenestrels further argue that Bachman was not disinterested because his wife attended college with Warden IV's wife and that they all socialize together. Comment g to section 7.09 of the ALI Principles indicates that

although the definition of 'interested' looks only to economic and familial associations, the requirement of a capacity for 'objective judgment' invites the court to look to other relationships that may also bias the inquiry. For example, a director who was the close personal friend and next-door neighbor of the defendant would probably lack this capacity and should not serve on the committee.

However, Judge Burr did not err or abuse his discretion in response to this issue and in concluding that Bachman was disinterested. Judge Burr noted that Bachman, experienced in economics and finance, joined the board in 2000 at the request of Warden IV, described by Bachman as "an

acquaintance." Order at 6 (citing N.T. Hearing, 9/8/06, at 109, 115). Bachman stated that his wife and Warden IV's wife shared an apartment (with others) for one year while students at Bucknell University and that they socialized together one or two times per year at Bucknell alumni functions. *Id.* at 7; N.T., 9/8/06, at 109–111. Judge Burr concluded: "[T]he nature of these infrequent social contacts is not sufficient to establish that Mr. Bachman did not possess the requisite degree of independence for purposes of serving as a member on the [C]ommittee." Order at 7. We agree—the record reveals that Bachman is not so close a friend who would necessarily be conflicted in serving as a member of a special litigation committee investigating alleged wrongdoing by Warden IV. Again, in sum, the Committee's formation and investigation was conducted in accordance with the relevant law and ALI Principles, and Judge Burr did not err or abuse his discretion by concluding that the Committee's decision to not pursue the derivative claims is entitled to the protection of the business judgment rule.

¶ 42 In their fourth issue, the LeMenestrels contend that the trial court should have treated their case as a direct action, rather than a derivative action. They rely on section 7.01(d) of the ALI Principles, which reads as follows:

> In the case of a closely held corporation [§ 1.06], the court in its discretion may treat an action raising derivative claims as a direct action, exempt it from those restrictions and defenses applicable only to derivative actions, and order an individual recovery, if it finds that to do so will not (i) unfairly expose the corporation or the defendants to a multiplicity of actions, (ii) materially prejudice the interests of creditors of the corporation, or (iii) interfere with a fair distribution

of the recovery among all interested persons.

We conclude that Judge Burr did not abuse his discretion by failing to treat the LeMenestrels' suit as a direct action as opposed to a derivative action. First, the LeMenestrels' claims are properly characterized as derivative claims alleging breaches of fiduciary duties on the part of certain directors, and the cover sheet of the complaint itself indicates that it is filed derivatively as well as the title preceding the first paragraph, which indicates, in all capital letters, "DERIVATIVE COMPLAINT." Additionally, the LeMenestrels fail to point to places in the record that support their argument that all of the criteria noted above, *i.e.*, that a direct action would not expose the corporation or defendants to multiple actions, materially prejudice creditors, etc., are present in the instant case. In fact, the LeMenestrels in their brief merely recite the text of section 7.01(d) and nothing more. Essentially, the LeMenestrels have failed to develop their argument to establish that their fourth issue has merit. Pa.R.A.P. 2119.

¶ 43 Next, although the LeMenestrels fault Judge Burr for making findings of fact, he did so in compliance with *Cuker* after six days of hearings, which followed a period of time in which the parties were permitted to engage in discovery on the relevant issues of whether the special litigation committee was properly formed, etc., as fully described above. In the same vein, the LeMenestrels argue that Judge Burr's findings and conclusions were against the weight of the evidence. However, our focus in the instant type of case is whether Judge Burr erred or abused his discretion by concluding that the criteria of the relevant ALI Principles were met so as to apply the business judgment rule to protect the Committee's decision to seek dismissal of the derivative suit, as fully described above, without delving into the

merits of the underlying allegations of wrongdoing. The record amply supports Judge Burr's conclusions (following extensive hearings and analysis) that the Committee, consisting of three members, was properly formed, independent, disinterested, adequately informed, conducted an investigation that was adequate in scope, properly utilized the professional assistance of independent and highly-competent outside counsel, acted in good faith, and produced an extensive report that facilitated court review. Accordingly, under the relevant ALI Principles, Judge Burr properly applied the business judgment rule, sustained the defendants' preliminary objections, and dismissed the derivative suit.

¶ 44 Order affirmed.