J-A13012-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.M.L.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: E.M., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 92 EDA 2021 |

Appeal from the Order Entered December 23, 2020
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000766-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: A.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: E.M., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 93 EDA 2021 |

Appeal from the Order Entered December 23, 2020
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000466-2018

BEFORE:   BENDER, P.J.E., DUBOW, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BENDER, P.J.E.:                    **FILED JUNE 29, 2021**

E.M. ("Father") appeals from the orders entered on December 23, 2020, which granted the petitions filed by the Philadelphia Department of Human Services ("DHS"), to involuntarily terminate his parental rights to minor daughter, A.M.L.M. a/k/a A.M. ("Child") (born in October of 2013), pursuant

---

[*] Former Justice specially assigned to the Superior Court.

to sections 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, and to change the permanency goal for Child from reunification with Father to adoption.[1, 2]  After careful review, we affirm.

We glean the following facts and procedural history from the record. DHS became involved with this family on March 4, 2018, after receiving notice that Mother had given birth to Child's younger sibling, S.M., and that S.M. had tested positive for heroin at birth.  Father and Mother were not in a relationship or residing together at the time, as Mother was residing with the father of S.M. On March 5, 2018, DHS obtained an order of protective custody and placed Child with her maternal grandmother ("MGM").  On March 16, 2018, Child was adjudicated dependent.  Father's whereabouts were unknown at the time; thus, a parent locator search was ordered by the court.  Additionally, the court ordered that, once Father was found, he must forthwith submit to drug screens, random urine screens, a dual diagnosis assessment, and relevant programs at the Achieving Reunification Center ("ARC").  Father was granted supervised visits with Child.

After the Community Umbrella Agency ("CUA") case-management team reported that it had been unsuccessful in locating Father, and Father failed to

---

[1] By *per curiam* order entered on March 8, 2021, this Court consolidated the appeals at Nos. 92 and 93 EDA 2021, *sua sponte*, as the appeals involve related parties and issues.

[2] Mother signed a petition to voluntarily relinquish her parental rights to Child on September 26, 2019.  Said petition was confirmed by the court on December 23, 2020.  Mother is not a party to this appeal.

appear at the first three permanency review hearings held on June 11, 2018, September 10, 2018, and December 7, 2018, the court further ordered Father to sign releases and to provide employment verification, in addition to his previously stated goals. At the next hearing, on March 5, 2019, Father was in attendance. He was reported to be in substantial compliance with his reunification goals at that time. Again, drug screens, supervised visitation, and re-referral for appropriate ARC services were ordered, in addition to an assessment of Father's home and the option to modify visits between Father and Child prior to the next court date. Father was also in attendance at the review hearing on May 28, 2019, at which the court directed all prior orders were to stand.

Another review hearing was held on August 23, 2019, but Father did not attend. The court took notice of the urine screens submitted by Father since the last court date, which were all negative. The court further noted that Father was in moderate compliance with his goals, and it ordered that Father could have unsupervised visits with Child should he become fully compliant. On October 15, 2019, DHS filed petitions for the involuntary termination of Father's parental rights and to change Child's permanency goal from reunification to adoption. Due to COVID-19 restrictions, the hearing on these petitions was not held until December 23, 2020.

In the meantime, another permanency review hearing was conducted on November 15, 2019, at which Father was deemed to be in moderate compliance with his goals. The court expanded Father's visits with Child to

liberal, unsupervised visits in the community. In addition, the court ordered an assessment of Father's residence, where he resided with his mother (Child's paternal grandmother), as well as appropriate clearances. The court further ordered Father to provide a work schedule to the case-manager and to obtain a notarized letter from his mother indicating that she permitted Father and Child to reside in her home. At the next review hearing, on September 9, 2020, Father was deemed to be in minimal compliance of his goals. A January 23, 2020 urine screen was reported as negative to the court. The court directed CUA to supervise visits once per month, ordered Father to provide additional drug screens, and scheduled a review hearing for November 5, 2020. On November 5, 2020, the trial court granted Father's request for a continuance.

At a joint termination and goal change hearing on December 23, 2020, the court heard testimony virtually from DHS's witnesses, Naima Barnett, the assigned CUA case manager from Turning Points for Children, and Desiree Hodge, the permanency specialist assigned to the case, also from Turning Points. Attorney Daniel Kurland represented Child's legal interest and stated on the record that Child informed him she wished to remain in her current placement with MGM. Finally, Father testified on his own behalf. Following the testimony, submission of exhibits, and argument by counsel, the trial court granted the petitions and entered orders terminating Father's parental rights and changing Child's goal to adoption.

On January 4, 2021, Father filed timely notices of appeal. Herein, he presents the following issues for our review:

1. Whether the trial court committed reversible error when it determined that there was sufficient evidence exhibited to rise to the level of clear and convincing to support the finding that there was an insufficient father-child bond and that changing the goal to adoption would not cause irreparable harm to … [C]hild[,] despite the evidence that there was a strong bond between [F]ather and [C]hild and the only evidence in support [of the finding] that it was [not] a parent-child bond was that Father was not the one to be providing for her daily needs[?]

2. Whether the trial court committed reversible error when it determined that there was sufficient evidence exhibited to rise to the level of clear and convincing to support the finding that … [C]hild could not safely be reunified with … [F]ather[,] presently or in the near future, with or without assistance to remedy any dependent issues that may (or may not) exist despite testimony that Father's home was appropriate and there were no specifically articulable safety concerns preventing reunification[?]

3. Whether the trial court committed reversible error when it determined that there was sufficient evidence exhibited to rise to the level of clear and convincing to support the finding that … [C]hild's current placement is the least restrictive placement that meets the needs of … [C]hild and there is no less restrictive alternative available, in light of the fact that [F]ather's own residence would meet those needs[?]

4. Whether under the Juvenile Act,[3] 42 Pa.C.S.[] § 6351, and 55 Pa.Code § 3130.74, in accordance with the provisions of the Federal Adoption and Safe Families Act, 42 U.S.C. § 671 *et seq*., the goal change to adoption was the disposition best suited to the safety, protection, and physical, mental, and moral welfare of … [C]hild, despite the strong bond between Father and [C]hild and the ever-growing relationship between … [C]hild and her half-brother in [F]ather's custody[?]

_____

[3] 42 Pa.C.S. §§ 6301- 6375.

5. Whether the trial court made reversible error in its determination that [the] presented evidence satisfied the clear and convincing standard to support termination of parental rights insofar as, pursuant to:

   a. 23 Pa.C.S.[] § 2511(a)(1), Father maintained his visitation and interaction with … [C]hild and efforts towards his goals, [and] evidenced to the trial court a settled purpose to maintain and foster an ongoing relationship with … [C]hild;

   b. 23 Pa.C.S.[] § 2511(a)(2), no evidence presented suggested that Father could not or would not remedy any and all causes for … [C]hild's placement;

   c. 23 Pa.C.S.[] § 2511(a)(5), … [C]hild was not removed from Father's care, but that of … Mother's; and

   d. 23 Pa.C.S.[] § 2511(a)(8), … [C]hild was not removed from Father's care, but that of … Mother's.

6. Whether the trial court erred in finding that there was not a sufficient father-child bond and that … [C]hild would suffer no irreparable harm upon termination of [F]ather's parental rights pursuant to the requirements of 23 Pa.C.S.[] § 2511(b)[?]

Father's Brief at 4-5.[4]

First, we address Father's issues 5 and 6, concerning the trial court's involuntary termination of his parental rights. In doing so, we are mindful of the following:

When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to

---

[4] We address Father's issues out of order for ease of disposition.

- 6 -

determine whether the trial court's decision is supported by competent evidence.

*In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (quoting *In re S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005)). Moreover, we have explained that:

> The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id.* (quoting *In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004). If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result. *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa. Super. 2003).

We are also mindful that termination of parental rights is governed by section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Our case law has made clear that under [s]ection 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [s]ection 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [s]ection 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S. § 2511, other citations omitted). The burden is on the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *R.N.J.*, 985 A.2d at 276.

With regard to section 2511(b), we direct our analysis to the facts relating to that section. This Court has explained that:

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id.* However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id.* at 763.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

Instantly, the trial court terminated Father's parental rights pursuant to sections 2511(a)(1), (2), (5), (8), and (b). We need only agree with the trial court as to any one subsection of section 2511(a), as well as section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Herein, we analyze the court's decision to terminate under section 2511(a)(1) and (b), which provide as follows:

**(a)** **General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1)  The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

\*\*\*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (b).

We first address whether the trial court abused its discretion by terminating Father's parental rights pursuant to section 2511(a)(1).

To satisfy [s]ection 2511(a)(1), the moving party must produce clear and convincing evidence of conduct sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties.

*In re C.M.S.*, 832 A.2d 457, 461 (Pa. Super. 2003) (quoting *Matter of Adoption of Charles E.D.M., II*, 708 A.2d 88, 91 (Pa. 1998)).  In *C.M.S.*, we further acknowledged the following statement by our Supreme Court:

There is no simple or easy definition of parental duties.  Parental duty is best understood in relation to the needs of a child.  A child needs love, protection, guidance, and support.  These needs, physical and emotional, cannot be met by a merely passive

- 9 -

> interest in the development of the child. Thus, this [C]ourt has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.
>
> Because a child needs more than a benefactor, parental duty requires that a parent 'exert himself to take and maintain a place of importance in the child's life[.']

*C.M.S.*, 832 A.2d at 462 (quoting *In re Burns*, 379 A.2d 535, 540 (Pa. 1977)).

Instantly, Father claims the trial court erred in terminating his parental rights under section 2511(a)(1). He argues that the evidence presented at trial demonstrated he had completed many of his goals, continued to regularly visit and engage with Child, and actively sought reunification with her in his residence. Father's Brief at 15. More specifically, Father asserts that he was deemed moderately complaint with his objectives during the six months prior to the filing of DHS's petition, and he points to his completion of a drug and alcohol program in July of 2019. *Id.* at 20. He avers that once he became aware of Child's involvement with DHS and made contact with CUA, he never stopped engaging with Child. *Id.* While Father acknowledges that he had "continued communication breakdowns" with CUA, he states that there is no evidence to suggest a settled purpose to relinquish his parental rights. *Id.* Additionally, Father argues that DHS was unsuccessful in establishing that he failed to perform his parental duties during the period of time in question, as he claims that he maintained contact with Child and "even purchased a phone

- 10 -

for her[.]" *Id.* at 20-21. Father adds that "[h]is need to maintain employment was a constant barrier to the hoops in which he was asked to jump through, but at no time does the record reflect that he shirked parental duties as defined by the law." *Id.* at 21.

In response to Father's claim, DHS correctly notes that while the six-month look-back period provided for in section 2511(a)(1) is most essential to the court's analysis, it is not mechanically applied. DHS's Brief at 14. The court must consider the entire history of the case. *See In re I.J.*, 972 A.2d 5 (Pa. Super. 2009) ("The trial court must examine the individual circumstances of each case and consider all of the explanations of the parent to decide if the evidence, under the totality of the circumstances, requires involuntary termination."). In response to Father's assertion that DHS failed to establish that he relinquished his parental claim to Child, DHS further notes that the trial court's termination under section 2511(a)(1) is predicated on Father's failure to perform parental duties—not necessarily on his having evidenced a settled purpose to relinquish his claim to Child. DHS's Brief at 14-15. As DHS aptly states, "Father failed to perform the most fundamental and essential duties of a parent whose child is in foster care, which are to cooperate with the agency, work toward … reunification, remedy the conditions that led to the child's continued placement, and [to] do so in a timely manner." *Id.* at 15. DHS adds that Father's reference to "jumping through hoops" is telling as to his lack of commitment to remedying the conditions that led to Child's placement and to work toward reunification. *Id.*

The record establishes that Child was initially removed from Mother's care as a result of her inability to provide Child with safety and security, as well as her inability to meet Child's developmental, physical, and emotional needs, due to her heroin use and mental health issues. *See* N.T. Hearing, 12/23/20, at 11. Although Father had been involved in Child's life prior to her removal from Mother's care, he never had custody of Child and had lost contact with Child by the time of her removal. DHS's Brief at 15-16. Once he became aware that Child had been removed from Mother's care, Father made little effort to locate and reestablish contact with her. *Id.* at 16. Moreover, after his release from incarceration in December of 2018, Father was given the opportunity to prove to the court that he could provide Child with proper parental care; however, he did not meaningfully engage with his plan objectives or cooperate with CUA. *Id.* Ms. Barnett testified that she attempted to work with Father to accommodate his work schedule, but that he failed to provide her with dates and times he would be available to meet with her. Additionally, Father failed to appear at the appointed time for random drug screens. Instead, he would show up days after his scheduled appointment, evading the court's efforts to ascertain he status of his substance abuse. *Id.* at 16-17, 19.

Father's lack of seriousness in working toward reunification with Child was further demonstrated by his delay in an assessment of his home, which was not completed until just seven weeks before the termination hearing. At this point, Child had already been in MGM's care for 32 months. DHS's Brief

at 17. Father also waited until the day before the September 9, 2020 permanency review hearing to complete a parenting class, which had been a court-ordered plan objective since the outset of the case. *Id. See also* N.T. Hearing at 15. The successful completion of his plan objectives was essential in demonstrating to the court that Child could safely be reunified with Father. However, Father's failure to "act affirmatively, with good faith interest and effort, to maintain the parent-child relationship to the best of his … ability fully supports the trial court's decree of involuntary termination of his parental rights pursuant to [s]ection 2511(a)(1)." *Id.* at 17 (citing *In re G.P.-R.*, 851 A.2d 967, 977 (Pa. Super. 2004) (internal quotation marks omitted)).

After taking into consideration all the evidence presented at the termination hearing, the trial court concluded:

> [F]ather hasn't done assessments[,] nor [has he] submitted to random[ drug screens], as [the] court ordered, and there's still no documentation as to his sobriety. Despite additional support from the permanency specialist, [F]ather has failed to meet his single case plan objectives and progressed [*sic*] to the point that [Child] should be reunited with him. The testimony also reflects that [F]ather made attempts to comply with the single case plan objectives … pretty recently, but that's after the termination petitions were filed. These efforts cannot be considered.[5]

N.T. Hearing at 110 (paragraph break omitted). Accordingly, the court terminated Father's parental rights to Child under section 2511(a)(1).

_____

[5] "With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall *not* consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S. § 2511(b) (emphasis added).

We deem the trial court's ruling to be further supported by the following, as stated by DHS:

As this [C]ourt noted in *In re Adoption of A.M.B.*, 812 A.2d 659[, 675] (Pa. Super. 2002), "[a] child's life, happiness[,] and vitality cannot be put on hold until a parent finds it convenient to perform parental duties." Accordingly, this [C]ourt should affirm the involuntary termination of [Father's] parental rights so that the 33-month "hold" that Father has placed on Child's life may be lifted, and Child [may be] freed for adoption and permanency in the care of MGM.

Father claims that [he] had fulfilled his parental duties because he had housing, employment[,] and the means to care for his daughter; however, Father ignores his ongoing failure to timely and meaningfully address the issues that kept Child in care and prevented her safe reunification. Instead, Father claims that there is the absence of a nexus between his failure to comply with [single case plan ("SCP")] objectives and the existence of a risk to Child's safety. However, the evidence clearly established that Father failed to meet his duty to provide safety for Child by knowingly leaving her in the care of Mother, who was an active drug user, by failing to search for her after her whereabouts became unknown to him, and by failing to inquire as to her safety and wellbeing after she had been placed in kinship care with MGM. The evidence further established that after he became involved in this matter in March [of] 2019, he failed to meet Child's day-to-day needs, such as … by attending routine medical appointments and school meetings with her, which he utterly failed to do. Further, Father's failure to comply with the court[-]ordered assessment and random drug screens prevented DHS, CUA[,] and the court from ruling out that Father had a substance abuse problem, which was a serious concern since Father had reported that he had been through at least one substance treatment program.

Next, Father points to the unsupervised community visitation he had with Child to challenge the trial court's well[-]supported findings that he had not completed assessments and random drug screens[] and[,] therefore[,] lacked documentation as to his sobriety. Father argues that the trial court impermissibly shifted to him the burden concerning his sobriety; however, the burden never shifted…. [T]he evidence established that Father never

attended the court-ordered assessment[,] despite several referrals having been made by the court, and that he evaded every random drug screen that he was ordered to attend, by showing up days after the appointed time for the screen. In short, the evidence established that Father willfully evaded the efforts of the court and CUA to ascertain the status of his substance abuse.

DHS's Brief at 18-19 (citations to record omitted). After careful review, we conclude that the record supports the trial court's finding of clear and convincing evidence that Father failed or refused to perform his parental duties for the statutory period provided in section 2511(a)(1). As such, we discern no abuse of discretion or error of law in the court's termination of Father's parental rights under this section.

As for the court's analysis under section 2511(b), Father argues that the trial court failed to consider the bond between him and Child. Father asserts that Child recognized him, that she saw him as her father, and that a bond existed between them. Father's Brief at 17. Moreover, he claims that Ms. Barnett's testimony regarding the nature of his relationship with Child is "wholly incompetent" as a basis to support the severing of their bond. *Id.* Finally, he states that "[j]ust because [C]hild's needs could be met in her kinship home does not in anyway speak to whether … [C]hild would suffer irreparable harm by the termination of her bond with Father." *Id.* at 25.

DHS counters that Father has never provided for Child's day-to-day needs, nor has he ever attended any of her medical appointments or school meetings. DHS's Brief at 25. "While Child knows who Father is, 'she doesn't look to him to provide nurturing or to provide all her needs.'" *Id.* (internal brackets and citation omitted). Rather, Ms. Burnett testified that Child's

- 15 -

primary bond is with MGM, to whom Child looks for nurturing, comforting, and for "providing all her needs, medical care, and … things like that." N.T. Hearing at 28, 30-31. Additionally, DHS proffers that, even if we assume that Father has a strong, loving bond with Child,

> the law is clear a bond alone does not override the best interests of a child. As noted in [*In re*] *K.M.*, "the mere existence of an emotional bond does not preclude the termination of parental rights." [*In re K.M.*,] 53 A.3d [781,] 791 [Pa. Super. 2012)]. In determining whether to terminate parental rights,
>
> > The trial court can equally emphasize the safety needs of the child, and should consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.
>
> *Id.* Here, the trial court properly emphasized Child's safety needs and her relationship with MGM in determining that Father's parental right should be involuntarily terminated in accordance with section 2511(b). Based on the evidence, it is clear that Child will not suffer irreparable harm from the involuntary termination of Father's parental rights and that it is in her best interest to terminate his parental rights so that she may achieve permanency and stability in a loving, supportive and caring adoptive home.

*Id.* at 25-26. Moreover, counsel for Child reported that Child expressed a desire to remain with MGM. Child's Brief at 16 (citing N.T. Hearing at 73).[6]

The trial court concluded that Child has been provided love, support, and safety under MGM's care, and that all of Child's needs are being met. N.T.

---

[6] We acknowledge Father's testimony that Child wants to live with him. *See* N.T. Hearing at 100 ("[S]he tells me right off the bat she wants to live with me."). We defer, however, to the trial courts determination regarding the credibility of witnesses. *See In re M.G.*, *supra*.

- 16 -

Hearing at 110. On the other hand, while Father visited Child when he could, the court found him to be merely "a visitation resource, not someone to whom [Child] turns for love, care, and subsistence." *Id.* Based on the foregoing, we deem the trial court's decision to terminate Father's parental rights under section 2511(b) to be supported by the record, and we discern no abuse of discretion or error of law.

Having determined that the trial court did not err in terminating Father's parental rights, we proceed with addressing the merits of Father's issues 1 through 4, pertaining to the permanency goal change.[7] In reviewing these claims, we are guided by the following:

> In cases involving a court's order changing the placement goal … to adoption, our standard of review is abuse of discretion. *In re N.C.*, 909 A.2d 818, 822 (Pa. Super. 2006). To hold that the trial court abused its discretion, we must determine its judgment was "manifestly unreasonable," that the court disregarded the law, or that its action was "a result of partiality, prejudice, bias or ill will." *Id.* (quoting *In re G.P.-R.*, 851 A.2d 967, 973 (Pa. Super. 2004)). While this Court is bound by the facts determined in the trial court, we are not tied to the court's inferences, deductions and conclusions; we have a "responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record." *In re*

_____

[7] We admonish Father's counsel for failing to comply with the requirements of the Pennsylvania Rules of Appellate Procedure regarding the organization of the appellate brief. Rule 2119(a) provides that the argument section of the brief is to be divided into as many sections as there are questions to be resolved. *See* Pa.R.A.P. 2119(a). Here, Father lists four issues in his Statement of Questions Involved concerning the permanency goal change. The argument section of his brief, however, only contains one section of argument pertaining to the goal change. We will nonetheless address Father's issues on the merits, because the violation does not fatally impede our review. *See Lemenestrel v. Warden*, 964 A.2d 902, 910 n.5 (Pa. Super. 2008).

*A.K.*, 906 A.2d 596, 599 (Pa. Super. 2006). Therefore, our scope of review is broad. *Id.*

*In re S.B.*, 943 A.2d 973, 977 (Pa. Super. 2008).

Furthermore, this Court has stated:

Placement of and custody issues pertaining to dependent children are controlled by the Juvenile Act[, 42 Pa.C.S. §§ 6301-65], which was amended in 1998 to conform to the federal Adoption and Safe Families Act ("ASFA"). The policy underlying these statutes is to prevent children from languishing indefinitely in foster care, with its inherent lack of permanency, normalcy, and long-term parental commitment. Consistent with this underlying policy, the 1998 amendments to the Juvenile Act, as required by the ASFA, place the focus of dependency proceedings, including change of goal proceedings, on the child. Safety, permanency, and well-being of the child must take precedence over *all* other considerations, including the rights of the parents.

*In re N.C.*, 909 A.2d at 823 (citations and footnotes omitted; emphasis in original). Additionally, we recognize that "the agency has the burden to show a goal change would serve the child's best interest…." *In re R.M.G.*, 997 A.2d 339, 347 (Pa. Super. 2010).

Specifically, section 6351 of the Juvenile Act provides direction to the court for the disposition of dependent children, stating in pertinent part:

**§ 6351. Disposition of dependent child**

…

**(f) Matters to be determined at permanency hearing.**—At each permanency hearing, a court shall determine all of the following:

    (1) The continuing necessity for and appropriateness of the placement.

(2)     The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.

(3)     The extent of progress made toward alleviating the circumstances which necessitated the original placement.

(4)     The appropriateness and feasibility of the current placement goal for the child.

(5)     The likely date by which the placement goal for the child might be achieved.

(5.1)   Whether reasonable efforts were made to finalize the permanency plan in effect.

(6)     Whether the child is safe.

                                    ***

(9)     If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child unless:

        (i)    the child is being cared for by a relative best suited to the physical, mental and moral welfare of the child;

        (ii)   the county agency has documented a compelling reason for determining that filing a petition to terminate parental rights would not serve the needs and welfare of the child; or

        (iii)  the child's family has not been provided with necessary services to achieve the safe return to the child's parent, guardian or custodian within

the time frames set forth in the permanency plan.

\*\*\*

**(f.1) Additional determination.** — Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:

(1)    If and when the child will be returned to the child's parent, guardian or custodian in cases where the return of the child is best suited to the safety, protection and physical, mental and moral welfare of the child.

(2)    If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(3)    If and when the child will be placed with a legal custodian in cases where the return to the child's parent, guardian or custodian or being placed for adoption is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(4)    If and when the child will be placed with a fit and willing relative in cases where return to the child's parent, guardian or custodian, being placed for adoption or being placed with a legal custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

\*\*\*

**(f.2) Evidence.**—Evidence of conduct by the parent that places the health, safety or welfare of the child at risk, including evidence of the use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk, shall be presented to the court by the county agency or any other party at any disposition or permanency hearing whether or not the conduct was the basis for the determination of dependency.

**(g) Court order.**—On the basis of the determination made under subsection (f.1), the court shall order the continuation, modification or termination of placement or other disposition which is best suited to the safety, protection and physical, mental and moral welfare of the child.

42 Pa.C.S. § 6351(f), (f.1), (f.2), (g).

Moreover, this Court has provided further considerations that apply in goal change situations, stating:

Because the focus is on the child's best interests, a goal change to adoption might be appropriate, even when a parent substantially complies with a reunification plan. *In re N.C.*, *supra* [at] 826-27. Where a parent's "skills, including her judgment with regard to the emotional well-being of her children, remain problematic[,]" a goal change to adoption might be appropriate, regardless of the parent's compliance with a permanency plan. *Id.* at 825. The agency is not required to offer services indefinitely, where a parent is unable to properly apply the instruction provided. *In re A.L.D.*, 797 A.2d 326, 340 (Pa. Super. 2002). *See also In re S.B.*, *supra* at 981 (giving priority to child's safety and stability, despite parent's substantial compliance with permanency plan); *In re A.P.*, 728 A.2d 375, 379 (Pa. Super. 1999), *appeal denied*, … 743 A.2d 912 ([Pa.] 1999) (holding where, despite willingness, parent cannot meet "irreducible minimum parental responsibilities, the needs of the child must prevail over the rights of the parent"). Thus, even where the parent makes earnest efforts, the "court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006).

*In re R.M.G.*, 997 A.2d at 347.

Here, Father argues the trial court erred in ruling that Child could not be safely reunified with him and that changing the permanency goal to adoption was in Child's best interest. Father's Brief at 26. To the contrary, he suggests that "no specific dependency issues with Father or his home

existed to prevent reunification, aside from [his] failure to follow court orders." *Id.* He avers that DHS failed to provide any evidence suggesting that Child "would be anything other than safe in his care[,]" and proffers that "[m]uch was made about [his] failure to comply to the letter with court orders[.]" Father insists that his home is "without question … safe and appropriate[,]" and accuses DHS and the court of failing to consider whether he could provide appropriately for Child. *Id.* at 26-27. Instead, Father suggests that "the question became one of whether [he] would jump through their hoops." *Id.* at 27.

Interestingly, what Father dismissively calls "hoops" are, in fact, the very court-ordered objectives that were designed with the intention of permitting Child to be reunified safely with Father. It is Father's continued lack of cooperation with DHS and CUA, as well as his failure to complete these objectives, which prevented DHS from being able to evaluate the safety of his home or his ability to provide for Child, and which convinced the court that reunification was no longer a viable outcome. The court's decision to change the goal to adoption is supported by DHS's reports that Father failed to avail himself of the services that were necessary for there to be a safe reunification. *See* DHS's Brief at 23 ("As Ms. Barnett … testified, she could not conclude that Father would or could provide safety for Child due to his consistent lack of cooperation with CUA and engagement with his SCP objectives throughout the life of the case.").

Moreover, Child had been placed with MGM for 33 months. Our review of the record reveals that, at each of the permanency review hearings, the trial court addressed the appropriate matters as set forth in section 6351(f) of the Juvenile Act. Specifically, the court found that Father has not been able to develop a bond with Child, that he has generally been only "moderately compliant" with his SCP objectives, and most recently at the September 9, 2020 review hearing, he was deemed to be in "minimal compliance" of his goals. Furthermore, the trial court found at every permanency review hearing that DHS made reasonable efforts to finalize Child's permanency goal of reunification. Despite these efforts, reunification had not occurred due to Father's lack of progress. Again, we emphasize that DHS is not required to offer services indefinitely where a parent fails to avail himself of the assistance provided, and "the court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *See In re R.M.G.*, 997 A.2d at 347 (citing *In re A.L.D.*, 797 A.2d at 340; *In re Adoption of R.J.S.*, 901 A.2d at 513).

We determine that there is competent evidence in the record to support the trial court's conclusion that, despite his attempts, Father made insufficient progress toward alleviating the circumstances that necessitated Child's original placement, nor did he establish that he is best suited to provide Child with safety, protection, and physical and moral welfare. Accordingly, we agree with the lower court's determination that Child's best interests are served by

changing her permanency placement goal from reunification to adoption, and we discern no abuse of discretion on the part of the trial court in so ordering.

Based on the foregoing, we affirm the December 20, 2020 orders involuntarily terminating Father's parental rights and changing the permanency goal to adoption.

Orders affirmed.

Judge Dubow did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/29/2021